Halina J. RUNYON, Appellant,

v.

William Richard REID et al., Appellees.

No. 42806.

Supreme Court of Oklahoma.

March 13, 1973.

Rehearing Denied June 18, 1973.

McConnico & Harris, by Warren L. McConnico and Sam Harris, Tulsa, for appellant.

Best, Sharp, Thomas & Glass, Joseph M. Best and Joseph A. Sharp, Tulsa, for appellee William Richard Reid.

Houston, Klein & Davidson, L. Michael Hager, Tulsa, for appellee Robert G. Tompkins, M.D.

Hudson, Wheaton & Brett, R. D. Hudson, Tulsa, for appellee Tulsa Psychiatric Foundation, Inc.

Alfred B. Knight, Richard D. Wagner, Tulsa, for appellees Clay Majors, Ralph Couch, individually and Ralph Couch, d/b/a Couch Pharmacy.

BERRY, Justice.

John Hutchinson Runyon's widow, Halina J. Runyon, plaintiff, brought this action for damages for his wrongful death against William Richard Reid, Robert G. Tompkins, the Tulsa Psychiatric Foundation, Inc., Ralph Couch Individually, Ralph Couch, an individual doing business as Couch Pharmacy, and Clay Majors. Defendants shall be referred to collectively as "defendants", and individually by name, except that Couch and Majors shall be referred to collectively as "Couch". The trial court sustained defendants' motions for summary judgment. Plaintiff appeals.

The allegations contained in plaintiff's second amended petition may be summarized as follows:

1. That at all times subsequent to August, 1957, decedent was a mentally incompetent person incapable of managing his own affairs;

2. That prior to his death, the Foundation and Reid, a doctor of medicine specializing in psychiatry in the City of Tulsa, treated decedent for mental ailments, and Tompkins, a doctor of medicine in general practice in the City of Tulsa, treated decedent for physical ailments, and each knew, or should have known of decedent's mental affliction;

3. That Reid, Tompkins, and the Foundation each: prescribed large quantities of potent, dangerous, and incompatible drugs for decedent, and failed to exercise, or attempt to exercise, any control over the type or quantity of drugs prescribed by the other defendants; allowed decedent to possess large quantities of potent, dangerous and harmful drugs; and failed to obtain proper and legal consent to and for the treatment of decedent through the use of drugs which were dangerous to the life and health of decedent;

4. That Reid failed to properly diagnose decedent's illness, and failed to inform decedent or plaintiff that decedent required further and different treatment from that he had been receiving;

5. That decedent had filled prescriptions by Reid, Tompkins and the Foundation at Couch Pharmacy, and that, in violation of applicable statutes, Couch refilled prescriptions for decedent without authority of the prescribing physician;

6. That by reason of the combined negligence of all defendants decedent was injured in his health and activity, and weakened in mind and body, and as a result of his weakened mental and physical condition, caused by the combined negligence of defendants in treatment, including the dispensing, administration, prescribing and sale of huge quantities of dangerous drugs, and permitting decedent to keep excessive-

ly large quantities of potent, dangerous and harmful drugs, and lack of supervision, control and direction of an incompetent and mentally ill person, John Hutchinson Runyon did die on March 19, 1964.

In support of their motions for summary judgment, defendants relied upon answers to interrogatories, responses to requests for admission of fact and depositions which were on file. The depositions included those of the pathologist who performed a post-mortem examination of the body, plaintiff, Reid, Tompkins and Ralph Couch. Plaintiff offered no evidentiary material, even though she could have done so.

In granting the motions for summary judgment the trial court found that decedent suffered from mental illness prior to his contact with or treatment by any of the defendants, that his death resulted from his taking an excessive overdose of Carbrital, and that there was no causal connection between the death of decedent and the alleged acts of negligence of the defendants.

Plaintiff contends that the trial court erred in granting defendants' motions. for summary judgment. The applicable rule, 12 O.S.1971, Ch. 2, App. Rule No. 13, provides in part as follows:

"A party may move for judgment in his favor where the deposition, admission, answers to interrogatories and affidavits on file show that there is no substantial controversy as to any material fact. The adverse party may file affidavits or other materials in opposition to the motion. * * * The court shall render judgment if it appears that there is no substantial controversy as to any material fact and that any party is entitled to judgment as a matter of law. * * *"

■ In cases such as this where defendant moves for a summary judgment and is not relying upon an affirmative defense, the defendant must show that there is no substantial controversy as to one fact material to plaintiff's cause of action and that

this fact is in defendant's favor. Fraser, "Judgment Where Facts Not Controverted"; 36 OBJ 723; Lang v. Cruz, 74 N.M. 473, 394 P.2d 988. See also Washington v. World Publishing Co., Okl., 506 P.2d 913.

■ Once defendant has introduced evidentiary materials indicating that there is no substantial controversy as to one fact material to plaintiff's cause of action and that this fact is in defendant's favor, plaintiff then has the burden of showing that evidence is available which would justify a trial of the issue.

In Aktiengesellschaft Der Harlander, etc. v. Lawrence Walker Cotton, 60 N.M. 154, 288 P.2d 691, the court stated this principle as follows:

"* * * the moving party has the burden of showing that there is no genuine issue as to a material fact and that he is entitled to judgment as a matter of law but * * * when he has made a prima facie showing to this effect *the opposing party cannot defeat a motion for summary judgment* and require a trial *by a bare contention that an issue of fact exists.* He must show that evidence is available which would justify a. trial of the issue." (Emphasis supplied.)

"When on the basis of established facts, the plaintiff is entitled to summary judgment as a matter of law, the defendant contending and arguing that there is a genuine issue of material fact cannot and will not make it so."

■ Summary judgment will be denied if under the evidence reasonable men might reach different conclusions from undisputed facts. Flick v. Crouch, Okl., 434 P.2d 256; Perry v. Green, Okl., 468 P.2d 483.

■ Therefore, it is necessary for us to examine the pleadings and evidentiary materials to determine what facts are material to plaintiff's cause of action, and to determine whether the evidentiary materials introduced indicate that there is no substantial controversy as to one material fact and that this fact is in defendant's favor.

Decedent suffered from a serious emotional disorder. This condition existed long before he had contact with any of the defendants herein.

On three occasions, once in 1947, once in 1955 and once in 1956, decedent was admitted to a hospital for the mentally ill. On each occasion he was hospitalized for more than six months. The second hospitalization occurred after decedent had threatened to commit suicide. In the summer of 1957, decedent was released from the hospital on convalescent leave with a recommendation that he seek psychiatric help.

In August 1957, he became a patient at the out-patient clinic owned and operated by the Foundation. He visited the clinic until October, 1963. The Foundation's doctors diagnosed decedent's illness as, essentially, schizophrenia.

In June, 1963, decedent's symptoms became more severe. The Foundation referred decedent to Reid for in-hospital treatment. Decedent was hospitalized from June 4, 1963, until June 28, 1963, as Reid's patient. Decedent had office consultations with Reid concerning his symptoms on five occasions between October 22, 1963, and February 22, 1964, and had telephone consultations on the average of once or twice a month during that period. Reid diagnosed decedent's illness as schizophrenia.

Between December, 1959, and March 19, 1964, Tompkins treated decedent for various physical ailments.

The Foundation, Reid, and Tompkins each prescribed various drugs for decedent. Tompkins was aware of decedent's emotional disorder, and was aware that decedent was receiving treatment for his emotional problem from Reid and the Foundation.

In Reid's opinion people with schizophrenia do not have strong suicidal tendencies, but suicide is a possibility. When a person with schizophrenia remains in a withdrawn and depressed state for several weeks or months, there is an increasing chance of suicide. Reid did not recall decedent ever mentioning suicide to him. In Reid's opinion decedent's schizophrenia was of the mild to moderate form, and decedent was harmless, frightened, scared and dependent. Reid prescribed various common "psychiatric" drugs for decedent, including tranquilizers, to calm decedent's nerves, and antidepressants to combat emotional depression. In prescribing drugs Reid relied upon his medical background, training and experience and current literature. In his opinion the drugs he prescribed were well within the limits permissible for non-hospitalized patients. He was generally aware of the types of drugs prescribed by the Foundation, Tompkins and himself. He was aware of no reports indicating that the drugs prescribed by him were incompatible with antihistamines prescribed by Tompkins. He stated that none of the drugs prescribed by him were incompatible with each other, except that Parnate and Elavil might be incompatible if taken together over a period of time. However, he did not prescribe these drugs at the same time. If decedent had toxic manifestation from any drugs prescribed by Reid or others, Reid was not aware of it.

Tompkins prescribed Carbrital, a sleep inducing drug, for decedent. Sixty tablets of this drug were prescribed on August 2, 1961, twelve tablets on January 21, 1964, 12 tablets on January 27, 1964, sixty tablets on January 30, 1964, and sixty tablets on February 27, 1964. Reid knew Tompkins had prescribed a sleeping pill for decedent.

Reid stated that he would have agreed with Tompkins' decision to prescribe sixty Carbrital tablets at a time because sixty pills constituted a month's supply, and decedent had never given any indication that he was exceeding the prescription.

Decedent filled numerous prescriptions at Couch Pharmacy. On March 18, 1964, Couch refilled decedent's prescription for sixty Carbrital tables. This refill was not approved by Tompkins. Therefore, in refilling the prescription, Couch apparently violated the provisions of 63 O.S.1961, § 465.12, [since repealed] which made it un-

lawful for a pharmacist to refill barbiturate prescriptions without permission of the prescribing physician. The label on the bottle containing these pills prescribed one or two pills nightly.

On March 19, 1964, decedent died. The container for the 60 Carbrital pills decedent had acquired on March 18, 1964, was found empty near decedent's body.

A post-mortem examination was conducted the next morning. The doctor who conducted it was of the opinion that the cause of death was barbiturate poisoning resulting from a massive overdose of sodium pentobarbital contained in the drug, Carbrital. He stated that at one time it was believed that approximately 5 grams of sodium pentobarbital [50 Carbrital pills] was the minimum fatal dose, but that recent studies had indicated that one gram [ten Carbrital pills] was the minimum fatal dose. He stated that decedent took at least 16 of the pills, and that the examination results would support a conclusion that decedent took nearly sixty of the pills. With reference to the time within which the pills were taken, he stated "at once, or in two doses, but not over a long time" and "we are speaking of minutes, not hours."

Decedent had consulted with Reid approximately three or four weeks prior to his death. Reid was of the opinion that decedent was competent and knew what he was doing.

Decedent worked for the same employer from 1959 until the time of his death. He was depressed for several weeks prior to his death, and stayed home on the two days [Tuesday and Wednesday] immediately preceding his death, and on the day of his death.

Plaintiff had dinner with decedent on Tuesday and Wednesday evenings, and they talked together. On the day of his death he had breakfast with plaintiff and their son. Plaintiff stated that at that time he acted fine considering the depressed mood he was in. Plaintiff then went to work and their son went to school. She talked to decedent by telephone at about 1:30 P.M. At that time he gave her very explicit directions to the effect that she should not contact his doctors. He further told her that he was going to see Reid and reassured her not to worry. She found decedent dead about 6:30 P.M.

During the last few weeks before decedent's death, plaintiff had threatened to "temporarily" leave him. She had been looking for an apartment for herself and her son. Plaintiff stated that, except for the time decedent was hospitalized, he was capable of following directions and knew what he was doing.

■ It is a well established principle that in order to recover damages for wrongful death alleged to have been caused by negligence, the plaintiff must establish that the defendant failed to exercise proper care in the performance of some legal duty owed to the decedent and that the negligent breach of this duty was the proximate cause of death. Southwestern Motor Carriers, Inc. et al. v. Nash, 195 Okl. 604, 159 P.2d 745.

In Hunt v. Firestone Tire & Rubber Co., Okl., 448 P.2d 1018, we stated:

"The proximate cause of any injury must be the efficient cause which sets into motion the chain of circumstances leading to the injury; if the negligence complained of merely furnished a condition by which the injury was possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury. * * *"

■ However, if the intervening cause is foreseeable, then the chain of causation extending from the original act to the injury is not broken by the independent intervening agency, and the original wrongful act will be treated as the proximate cause of the injury. Oklahoma Natural Gas Co. v. Courtney, 182 Okl. 582, 79 P.2d 235.

Defendants contend that the only reasonable inference which can be drawn from the evidence presented is that the decedent voluntarily committed suicide.

They then cite numerous cases from other jurisdictions which hold that in actions brought under a wrongful death statute the general rule applicable in situations where the defendant had no duty to protect the decedent from himself is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death, and therefore the wrongful act does not render the defendant civilly liable. Annotation, "Civil Liability For Suicide", 11 A.L.R.2d 751; Daniels v. New York, N. H. & H. R. Co., 183 Mass. 393, 67 N.E. 424; McMahon v. City of New York, 16 Misc.2d 143, 141 N.Y.S.2d 190, affirmed 3 A.D.2d 713, 159 N.Y.S.2d 266.

■ This principle is applicable only in situations where death results from the voluntary act of suicide.

Restatement(2d) Torts § 455, provides in part:

"If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

"(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

"(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason."

See also Orcutt v. Spokane County, 56 Wash.2d 846, 364 P.2d 1102.

In Tuscon Rapid Transit Co. v. Tocci, 3 Ariz.App. 330, 414 P.2d 179, the court, in discussing liability for suicide, stated:

"We recognize that in drawing a limit as to liability, based on the concept of superseding cause, courts are making a policy decision."

Plaintiff contends that the trial court erred in granting summary judgment because one reasonable inference which can be drawn from the evidence is that decedent did not intend to effect his own death. This question will be discussed subsequently. Plaintiff further alleges that even if decedent voluntarily committed suicide, the defendants can still be held liable.

As concerns defendant Couch, we infer plaintiff's contention to be that couch refilled the Carbrital prescription without consent of the prescribing physician, thereby violating what was then 63 O.S.1961 § 465.12, that the Carbrital pills were the instrumentality which caused decedent's death, and that therefore Couch should be liable for decedent's death.

In Larrimore v. American Nat. Ins. Co., 184 Okl. 614, 89 P.2d 340, this Court stated:

"It is not enough for a plaintiff to show that the defendant neglected a duty imposed by statute. He must go further and show that his injury was caused by his exposure to a hazard from which it was the purpose of the statute to protect him. * * * Negligence is a breach of duty. Those only to whom that duty is due and who have sustained injuries of the character its discharge was designed to prevent can maintain actions for its breach. * * *"

Further in Sinclair Prairie Oil Co. v. Stell, 190 Okl. 344, 124 P.2d 255, this Court stated:

"It is not enough for plaintiff to show that the defendant neglected a duty imposed by statute. He must go further and show that his injury was caused by his exposure to a hazard from which it was the purpose of the statute to protect him."

■■ We do not construe the statutory provision as imposing an affirmative duty upon a pharmacist to protect his customer from the customer's voluntary act of suicide. Therefore, we conclude that a pharmacist who refills a "non-refillable" drug prescription should not in all circumstances be liable for the death of a purchaser who uses the drugs so obtained to commit suicide.

In Riesbeck Drug Co. v. Wray, 111 Ind. App. 467, 39 N.E.2d 776, the court stated:

"The voluntary, willful act of suicide of an insane person, who knows the purpose and physical effect of his act, is such a new and independent agency as will not come within and complete a line of causation from a defendant's alleged negligent act in making sale of a substance or instrumentality with which human life may be taken, when there is nothing in the condition or circumstances to indicate to the seller that the substance or instrumentality will be used for such purpose. Death by self-destruction is not a result naturally and reasonably to be expected, solely, from the sale of substances or instrumentalities with which human life can be taken. * * *"

See also Scott v. Greenville Pharmacy, 212 S.C. 485, 48 S.E.2d 324, 11 A.L.R.2d 745; Eckerd's Inc. v. McGhee, 19 Tenn.App. 277, 86 S.W.2d 570.

Here it is not alleged that there was anything in the circumstances of the sale which should have made Couch aware that decedent intended to use the Carbrital to commit suicide.

■ Therefore, we conclude that if decedent willfully committed suicide, knowing the physical effect of his act, such act constituted an independent intervening cause and Couch's negligence was not the proximate cause of decedent's death.

■ As concerns Reid, Tompkins and the Foundation, plaintiff contends that they were knowingly dealing with a patient who suffered from a serious mental disturbance of long standing, and, since the act of suicide could have been anticipated, they may be held liable for the voluntary suicide of decedent if it resulted from some act or omission in their treatment of the decedent. In support of this contention she cites Meier v. Ross General Hospital, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519.

In that case the decedent committed suicide while he was a patient in defendant hospital's psychiatric wing. In an action to recover for decedent's death that court stated:

"If those charged with the care and treatment of a mentally disturbed patient know of facts from which they could reasonably conclude that the patient would be likely to harm himself in the absence of preclusive measures, then they must use reasonable care under the circumstances to prevent such harm."

We do not believe that this rule is applicable to the defendants Tompkins, Reid and the Foundation.

In the cited case the court was concerned with the liability of a hospital and the director of the hospital's psychiatric wing for the suicide of a hospitalized patient who was being treated for mental illness. Here decedent was an outpatient. It is obvious that defendants could not exercise the degree of control over decedent which a hospital could exercise over a patient.

■ A medical specialist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialist in the field in the same or similar communities. Eckels v. Traverse, Okl., 362 P.2d 680.

Schwartz, "Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry", 24 Vanderbilt L.Rev. 217, suggests that since the danger that a patient will intentionally injure himself is one risk a psychiatrist is trained to prevent, a psychiatrist might be held liable for the voluntary suicide of an unconfined patient in cases (1) where he makes a gross error in judgment with respect to whether a patient should be confined; (2) where, in situations where the risks of suicide are great, he writes a prescription ordering a number of pills which could be fatal if taken in one dose, and the patient uses the pills to commit suicide; and (3) where he negligently or intentionally discloses confiden-

tial communications made to him by the patient in situations where it is foreseeable that the disclosure might cause the patient to harm himself, and the disclosure is a decisive factor in the decedent's decision to commit suicide.

We do not construe plaintiff's petition to allege that Reid was negligent in failing to recommend that decedent be hospitalized, nor do we construe it as alleging that defendants disclosed confidential information.

■ Plaintiff's petition does allege that defendants were negligent in allowing decedent to possess large quantities of dangerous drugs.

This could be construed to be an allegation that they were negligent in allowing decedent to possess a large quantity of sleeping pills and that since decedent used the pills to commit voluntary suicide, defendants should be held liable for his death.

The facts presented indicate that neither Reid, Tompkins, nor the Foundation prescribed the particular pills which caused decedent's death.

Further, the facts indicate that the Foundation did not treat or care for decedent after October, 1963, and that the Foundation never prescribed Carbrital for decedent.

Tompkins did prescribe Carbrital for decedent. He was a general practitioner treating decedent's physical ailments.

Reid never prescribed Carbrital for decedent. However, he was aware that Tompkins had prescribed a sleeping pill for decedent. He could not be held liable under this theory unless he, as decedent's psychiatrist, had a duty to contact Tompkins and direct Tompkins to limit the number of sleeping pills prescribed for decedent.

■ Furthermore, we are of the opinion that there should be no liability under this theory unless a reasonably skillful psychiatrist using customary methods would have regarded decedent as a suicidal risk who should not have been given a large quantity of sleeping pills at any one time. Plaintiff does not allege that decedent exhibited strong suicidal tendencies. Plaintiff stated that he had only threatened suicide on one occasion, some nine years before his death. The record indicates that he had never previously attempted suicide. Reid's testimony implies that a reasonably skillful psychiatrist, using customary methods, would not have regarded decedent as a suicidal risk who should not have been allowed to possess sixty Carbrital pills at one time.

The only reasonable inferences which can be drawn from the evidence presented are that these defendants did not prescribe the particular pills which caused decedent's death and that a reasonably skillful psychiatrist would not have regarded decedent as a suicidal risk who should not have been allowed to possess large quantities of sleeping pills.

We conclude that even if a psychiatrist might be liable for the voluntary suicide of a patient in the three situations referred to above, such fact does not require reversal of the trial court's order granting summary judgment.

■ Such being the case, the sole remaining issue is whether any reasonable inference, other than that decedent's death resulted from his voluntary act of suicide, can be drawn from the evidence presented.

Plaintiff contends that decedent loved their son and would not have committed suicide when the son was expected home. She further relies upon the presumption against suicide. She contends that it can be inferred from the evidentiary material presented that decedent was suffering from drug intoxication and did not know the kind or quantity of drugs ingested, and that suicide is not an independent intervening cause if the injured party is unable to realize the nature of his act or is unable to control his conduct. She further contends that it can be inferred that decedent did not intend to commit suicide, but took the overdose of Carbrital because his physicians had "negligently implanted" in his

mind the idea that his only salvation lay in taking more and more drugs.

The evidentiary materials presented indicated that decedent was extremely intelligent. Carbrital is a sleep inducing pill, not a "psychiatric" pill. Within a very short period of time, a matter of minutes, decedent took at least eight times, and possibly as much as thirty times, the prescribed daily dosage of Carbrital. The number of pills taken far exceeded the daily dosage for any other drug which had been prescribed for decedent.

We conclude that it cannot reasonably be inferred that he did so believing that such would improve his mental condition.

Plaintiff last saw decedent alive on the morning of his death. She stated that decedent knew what he was doing and was capable of following instructions at all times except when he was hospitalized.

She stated that she spoke on the telephone with decedent at about 1:30 on the day of his death, and that at that time he gave her explicit instructions not to contact his physicians, told her that he was going to make an appointment with Reid, and told her not to worry.

The only reasonable inference which can be drawn from these facts, and the other facts set out above, is that decedent knew what he was doing and was capable of following instructions immediately before he ingested the fatal dosage of Carbrital and that this condition continued until he lost consciousness. He could not have swallowed any additional pills after he lost consciousness.

Since plaintiff made no showing that she had contradictory evidence indicating that at the time decedent ingested the fatal dosage he was suffering from drug intoxication, and as a result could have unintentionally taken the overdose, we conclude that the trial court could properly have assumed that plaintiff had no such evidence.

Furthermore, the evidentiary materials presented indicated that decedent had suffered from a serious emotional disorder for many years and was scared, frightened and dependent. His wife had, during the weeks prior to his death, threatened to "temporarily" leave him, and she had been looking for an apartment for herself and her son.

In Frankel v. New York Life Ins. Co., 51 F.2d 933 [10th Cir. 1931] the court stated:

"* * * the presumption against suicide is overcome by evidence showing the death was self-inflicted, or facts inconsistent with any reasonable hypothesis of death by accident, or circumstances and conditions leaving no room for any reasonable hypothesis but suicide, and it is where the facts in any particular case are disputable or are of such character that different minds might reasonably draw different conclusions therefrom, a question is presented for the determination of the jury."

We conclude that the only reasonable inference which can be drawn from the facts set out above is that decedent voluntarily committed suicide.

Such being the case, the trial court did not err in granting summary judgment for defendants.

Affirmed.

DAVISON, C. J., and IRWIN, BARNES, SIMMS and DOOLIN, JJ., concur.

WILLIAMS, V. C. J., and HODGES and LAVENDER, JJ., dissent.