Larry A. **WALLACE**, Appellee,

v.

**KENTUCKY FRIED CHICKEN OF LAW-TON, OKLAHOMA, INC.**, Appellant.

No. 46144.

Court of Appeals of Oklahoma,
Division No. 2.

July 2, 1974.

Released for Publication by Order of the
Court of Appeals Aug. 15, 1974.

Harbison & Weber, Altus, for appellee.

Hal L. Grider, Altus, for appellant.

BRIGHTMIRE, Presiding Judge.

During the evening of July 20, 1970, plaintiff—a member of the United States Air Force—while working off-duty hours as a Kentucky Fried Chicken cook, was severely burned when he was splashed with the contents of a hot pot of "burned grease" he was trying to pour into a 55-gallon drum behind the restaurant. The jury upheld his claim that the famous defendant caused the injury by failing to furnish a safe place for the airman to work and to warn him of the dangers involved, and awarded him a verdict of $5,820. The eating establishment appeals from a judgment entered on the verdict asserting that plaintiff's petition does not allege facts nor is the evidence adduced sufficient to authorize it.

Shortly after being assigned for duty at Altus Air Force Base plaintiff got a job washing pots and pans for defendant. Some two or three weeks later he was promoted to cook. In order that plaintiff properly handle his new position the manager told plaintiff that "Kentucky Fried Chicken had a definite process to go through, and . . . for [him] to watch the other cooks."

He learned, among other things, that grease had to be preheated in "large pans."

Said plaintiff, " . . . [T]hey've got several large pans on the fires that we turn the fire up as high as it will go, and there is a little dropper . . . you drop . . . into the pan and grease comes

out and fills the pan up . . . . [Y]ou have to watch the thermometer to make sure the grease doesn't get too hot."

He was told to get the grease up to about 400 degrees, drop the chicken in, then turn the fire down and allow to cool to around 200 degrees before securing a pressure top.

Once a batch of chicken is cooked it is emptied onto a wire mesh table top so that the chicken stays atop the wire, but the grease filters through and returns to the system for reuse.

Occasionally a pot of grease would get too hot and "burn." Burned grease was not to be recycled but taken "out back" and emptied "into one of two barrels that were out back for the burnt grease."

Plaintiff had emptied pots of burned grease two or three times without incident. This evening, July 20, he had worked late at the Base. When he did get to the restaurant he waited until business slacked off to grab a roast beef sandwich. This is when he noticed the very end pot smoking.

"I'll take care of it," he said as he turned the fire out. "I picked up the grease . . . went outside . . . started to pour [it] . . . into . . . barrel . . . about four-fifths full," testified plaintiff, "and there must have been some water or . . . something in there because I had no sooner started pouring it in, and all of a sudden it was like an explosion just like when grease hits water. It just seemed to pop at me. . . . I jumped back. . . . I don't know whether I dropped the pan, or it caught the side of the barrel or what. That was immaterial at the time to me. I was just trying to get away from that splattering grease. And in the process, grease was spilled down my chucka boot which is a half boot. It went right down my right foot. And it did smart."

The result was painful second and third degree burns requiring an extended period of recovery during which plaintiff underwent a skin graft operation on his right foot and physical therapy twice daily.

In regard to defendant's duty breaches plaintiff said he was not "given any sort of protective clothing, leather apron, asbestos gloves, or anything like" that to use in "handling this hot grease." He was given no warnings of dangers nor any instructions regarding the method of emptying hot grease pots into the barrel.

The "cause of this accident and injury . . . suffered" by plaintiff was the unseen presence of "water or some type of liquid in the 55 gallon drum"—a condition, plaintiff claimed, which was unsafe, dangerous, hidden, and unbeknownst to him.

Of course defendant adduced evidence contradicting plaintiff's particularly on the matter of instructions. Defendant's manager said, for instance, she instructed plaintiff to always use a towel while dumping an overheated pot. Significantly, however, there was neither direct nor circumstantial rebutting the presence of splatter-producing liquid in the barrel that fateful night.

Though these are the facts we still need to see what the controlling law is before we can decide defendant's first proposition —that the evidence is not sufficient to sustain the verdict—law which defendant mentions not at all.

■ To his servant a master owes nondelegable duties to furnish (1) a reasonably safe place to work; (2) reasonably safe materials and equipment with which to work; and (3) reasonably safe methods by which to work. Kansas City Bridge Co. v. Gravitt, 188 Okl. 30, 105 P.2d 767 (1940). And the master is obliged to warn or instruct his servant as to defects and dangers of which he knows or ought, in the exercise of reasonable care and diligence, to know, and of which a servant has no knowledge—an obligation that extends to all abnormal, unusual, peculiar or extraordinary risks or hazards of the employment. Haynie v. Haynie, Okl., 426 P.2d 717 (1966). To an inexperienced servant instructions must be given sufficient to enable him to fairly comprehend involved danger and safely perform the work. Chi-

cago, Rock Island & Pacific Ry. v. Hurst, 129 Okl. 1, 263 P. 113 (1928).

We think it obvious that the evidence introduced by plaintiff, both direct and circumstantial, permits finding that defendant's burned grease disposal system consisting of open drums completely exposed to the elements and easily accessible to the public—both of which can deposit water or watery substances in them—created an unreasonably hidden hazard of splattering when hot grease hits it. Defendant's duty was to recognize the danger, warn plaintiff of it, and devise a means and method of grease disposition which would minimize it. Thus we find no merit to defendant's first proposition.

Its second is that if any such "negligence" there be it "merely furnishes a condition by which the injury was" made possible and that "a subsequent independent act" was the "proximate cause of the injury" rather than the condition.

In the abstract defendant comes fairly close to reciting the doctrine of supervening cause. Its effort to apply the legal principle to the facts here go like: defendant's failure "to keep the barrel covered so as to not become partially filled with water or other substances which when mixed with hot grease would cause an explosion and . . . to warn . . . Plaintiff concerning the latent . . . danger . . . . merely furnished a condition by which his injury was possible and it was his, the Plaintiff's subsequent independent act of pouring the hot grease into the open barrel which caused the injury."

Two cases are cited as support for the contention—Kinder v. Godfrey, Okl., 315 P.2d 676 (1957); Speed v. Whalin, Okl., 386 P.2d 772 (1963)—neither of which applies or even discusses the principle of independent intervening cause (though *Kinder* inexplicably recites it in the second "Syllabus by the Court").

*Kinder* went off on the theory that a farm hand who lost his balance and fell into a cotton picking machine while trying to unclog it could not recover for conse-quential injuries from his employer based on a negligent failure to warn and instruct on a safe method of unclogging the machine because the danger attending the work was "obvious" and the risk of injury from obvious dangers is an exclusive possession of the employee concerning which no duty to warn or instruct exists.

In *Speed* an experienced carpenter fell from a roof while assisting a roofer. He blamed his resulting injuries on his employer's negligence in failing to provide him with proper scaffolding and ladders, and in unsafely stacking several glass windows on the ground below him without warning him of the hazard—an immaterial hazard since plaintiff did not hit the windows when he fell. The case went off on the court's failure to find evidence in the record supporting plaintiff's theory that he would have been using scaffolding or ladders at the time he fell even had they been furnished. Plaintiff's testimony was merely that he would have used such equipment and the court regarded this as too speculative in the absence of an explanation as to "how a scaffold or ladder would have been used" under the circumstances. Therefore the court concluded there existed no evidence upon which to predicate a finding that the employer breached any duty owing plaintiff.

Not every intervening cause will insulate an original wrongdoer from liability. Brodsky v. Atchison, Topeka & Santa Fe Ry., Okl., 368 P.2d 852 (1961). An intervening cause can and frequently does concur or combine with an earlier primary act to produce injury. In such cases both acts, if wrongful, subject each of the performers to liability for the entire result. Meyer v. Moore, Okl., 329 P.2d 676 (1958). Same thing is true where several causes operate to bring about a result. Green v. Sellers, Okl., 413 P.2d 522 (1966). But it is otherwise where the original actor's breach of duty is regarded by law as an incidental and inoperatively remote cause, or in his wrongdoing the original actor could not reasonably foresee or anticipate an in-

tervening causative act or force. The latter secondary cause is called a supervening one because as between it and the primary act, it is deemed to be the sole proximate or actionable one. Runyon v. Reid, Okl., 510 P.2d 943 (1973).

■ In the case at bar the defense of supervening cause was not pleaded by defendant and the evidence does not show one existed. No great strain would have been placed on defendant's imagination to forecast the occurrence of something akin to what actually happened to plaintiff here. Such foreseeability of potential harm transformed the exposed grease barrel into something more than a mere causally unrelated condition. It became as it were a pit in the path, a source of danger, an unreasonable risk of harm, and therefore a proximate cause of plaintiff's injuries.

Thus defendant's second proposition is without merit.

■ Its third one—that a "master is not bound to warn his servant against dangers which are patent and obvious"—must also be rejected, not because it recites an incorrect abstract legal principle, but because use of it is inappropriate in this case. We have already determined that the danger involved here was not "patent and obvious," but latent and obscure.

■ The fourth and last error said to have been committed was the admission of certain photographs depicting grease barrels behind the fried chicken establishment.

What happened was that defendant put on a witness who testified the restaurant had covers for the grease barrels which were on them at the time of the accident and kept on most of the time even to time of trial. When the witness said this the cross-examiner handed her four photographs marked plaintiff's exhibits showing some barrels with no covers on them.

Their admission was postponed pending proper identifying evidence which came in later as rebuttal. Plaintiff said he took the pictures himself August 29, 1972, (some three weeks before trial) behind defendant's restaurant and that they were true and correct depictions of the area. Among other things the pictures showed uncovered grease barrels out in the open partially filled with a substance plaintiff said looked like grease. And in one picture could be seen what appeared to be a beer can floating in the grease.

The complaint is that admission of the pictures deprived defendant of a fair trial by transgressing the rule of Massey v. Ivester, 168 Okl. 464, 33 P.2d 765 (1934) —that photographs "purporting to depict the conditions at the point of accident may be admitted in evidence, if it is proven or admitted that the objects surrounding the scene of the accident are in the same condition as they were at the time of the acts complained of, but may not be admitted as a 'stage setting' for the purpose of re-enacting the accident."

The rule is inapplicable to the situation here. The pictures were not offered or admitted to show a condition at the time of the scalding. They were admitted to impeach defense evidence that the barrels were always kept covered. This was permissible. Preston v. Ed Hockady Hardware Co., 137 Okl. 283, 279 P. 332 (1929). Moreover the verbal reaction of defendant's witness when confronted with the pictures was not such as to suggest she thought the pictures resulted from "stage setting." We think no error of consequence, if indeed any, was committed in admitting the photographs.

Since we find no reversible error in the record the judgment appealed from is affirmed.

BACON and NEPTUNE, JJ., concur.