**Paul SMITH and Emma Smith, Husband and Wife, Appellants,**

v.

**BOB BRYCE BUICK–OPEL, INC., an Oklahoma corporation, Appellee.**

No. 55186.

Court of Appeals of Oklahoma, Division No. 2.

Dec. 12, 1981.

Released for Publication by Order of Court of Appeals Jan. 15, 1982.

Fred J. Shaeffer, Norman, for appellants.

Robert L. Pendarvis, Luttrell, Pendarvis & Rawlinson, Norman, for appellee.

BOYDSTON, Judge.

Appeal is from summary judgment granted in favor of new car dealer against Customers who brought suit alleging Dealer misrepresented and sold them a "new" car which was in fact a "used" car. Trial court granted summary judgment under Dist.Ct. Rule 13, 12 O.S.1973 Supp. Ch. 2 App. We review the record, affidavits, pleadings and deposition and find, even though there are no material controverted facts, Rule 13 is inappropriate to resolve the divergent inferences to be drawn from the facts presented.

The operative facts are uncontroverted. Robert Hacker bought and took possession of a 1978 Mazda from Dealer on May 24, 1979. Dealer executed the Manufacturer's Statement of Origin (MSO)[1] in his favor; Hacker insured the car and drove it to and from work for five days, logging 409 miles on the odometer. Before the ten day dealer's tag and titling limit expired Hacker returned the car to Dealer and told him it was unsatisfactory. Dealer presumably voided the sales contract, gave him full credit on that purchase, then sold him a Fiat. The paper title was never obtained by Hacker from the tag agent, but he signed his name on the air-conditioner warranty and the owner's manual.

On June 29, 1979, Dealer sold the same Mazda to Plaintiff Customer without informing him it had been previously sold to Mr. Hacker. When asked about the 409 miles, the salesman said it had accrued during test drives by "prospective buyers." The sticker price was $7,124; Customer paid $6,000 cash. When Customer received the paperwork a few days later, he discovered Mr. Hacker's signature on the warranty. He then brought suit to recover for the difference in value between a "new" and "used" Mazda, other consequential damages, diminished warranty potential and punitive damages based on the misrepresentation.

Dealer filed numerous affidavits, deposition of Customer Paul Smith and several

1. MSO is the title transfer document by which a dealer passes title to the first buyer. It must be presented to a tag agent who then issues the registration and title certificate.

documents. Customers filed affidavit of Mr. Hacker which minutely detailed Customers' allegations, and an affidavit from a reputable car dealer which verified Customers' interpretation that the Hacker transaction was a "sale" within the commonly recognized standards in the automobile trade. In fact, he unequivocally declared the Mazda to be a "used" car at the time Customers bought it. Exhibits were attached which Customers allege were deliberately falsified to actively conceal and obliterate the Hacker transaction. These included the MSO, which appears to have been "signed over" by Dealer's manager in places where Mr. Hacker's name previously appeared. It is undisputed that a new Mazda is worth more than a used Mazda, though both are in similar condition.

On the other hand, Dealer presented an apparent "virgin title" with Customers appearing to be the original non-dealer owners. This was supported by an affidavit from the tag agent declaring it to be the original document, and declaring the Hacker transaction to be an error. Dealer attached a warranty verification tab-like document dated December, 1979, from the manufacturer which indicated the factory considered Customers to be the original purchasers. Dealer's answer and supporting evidence raises the defenses that: (1) Customers knew the car had 409 miles at the time of sale; (2) these miles were accrued during test drives by prospective buyers; (3) Mr. Hacker did not actually buy the car but was merely a prospective buyer testing the car; and (4) the Hacker transaction was not a trade-in, but merely a return of one car followed by the outright purchase of another. In other words, the defense is Customers bargained for a new car with 409 miles on it and that's what they got.[2]

The problem we have with that interpretation is it is just one of several logically permissible interpretations.

In its present posture, we find the record presents a fairly uncontroverted state of facts. However, the defense and summary judgment rest solely on one characterization of those facts. When taken in its simplest terms, Dealer, with the cooperation of the tag agent, has been able to present a post facto virgin title and obtain factory warranty approval of the transaction which takes care of the warranty problem. Customer knew the car had 409 miles on it and Dealer claims the value was actually $6,000 —so what's the difference to him whether it had been owned for five days by Mr. Hacker? The trial judge obviously agreed, substituting his judgment for that of the jury.

■ The facts not only support contrary conclusions and inferences, but actually weigh heavily in favor of Customers' preferred theory. For example, the jury could find quite simply: (1) that a buyer who is led to believe he is buying a new car is entitled to a new car, not a previously owned used car; (2) that because the MSO was signed over to Hacker and he paid for the car, drove it home, drove it to and from work, signed the owner's warranty card, insured it and kept it for five days that he had in fact bought it; (3) that Hacker simply traded it in on the Fiat; (4) that something really is fishy about the Dealer's theory of the transaction—particularly in light of the fact Dealer "lost" all the paperwork which reflects the actual nature of the Hacker transaction; (5) that Dealer had a very good reason not to tell Customers about the Hacker transaction—that being it would decrease the sale price; (6) that it makes no difference whether Dealer has been able to produce a virgin title after the fact through very questionable cooperation from the tag agent; (7) that the vague wording in the tag agent's "error" statement, together with the MSO, quite simply proves the car had been sold, thus reinforcing Customers' theory in the first place; (8) that, according to Customers' evidence, the car, as used, is worth only $5,500 instead of Dealer's claimed value of $6,000; (9) that Dealer practiced deliberate acts of decep-

---

2. The terms "new" and "used" as applied to motor vehicle transactions are defined in 47 O.S.1981 Supp. § 22.1 and clearly support Customers' position.

tion and these constitute actionable fraud; and (10) that a substantial verdict for punitive damages would deter other similarly situated dealers from altering records and fraudulently selling used cars by representing them as new.

Neither side is entitled to summary judgment even though the evidence preponderates heavily in Customers' favor. On the contrary, we find several issues which must be decided by the jury, including whether under the circumstances Customers justifiably relied on the misrepresentations, and whether or not this is a proper case for an award of punitive damages.

■ Where summary judgment has been granted, the appellate court is required to examine the pleadings and evidentiary materials and if the record discloses either controverted material facts or, if the uncontroverted facts support legitimate inferences favoring the well pled theory of the party against whom the judgment is granted, the judgment will be reversed. *Weaver v. Pryor Jeffersonian*, Okl., 569 P.2d 967 (1977); *Northrip v. Montgomery Ward & Co.*, 529 P.2d 489 (1974); *Runyon v. Reid*, Okl., 510 P.2d 943 (1973); [3] and Dist.Ct. Rule 13, 12 O.S.1973 Supp. Ch. 2 App.

We therefore reverse the decision rendered below and remand for further action consistent with the views expressed herein.

BACON, P. J., concurs.

BRIGHTMIRE, J., concurs in result.