**EDWARDS PETRO, INC. (Formerly Edwards & Gauntt Oil Co.), an Oklahoma corporation, Appellant,**

v.

**MIDLAND MORTGAGE CO., an Oklahoma corporation; Midland Advisory Co., an Oklahoma corporation; State Farm Life Insurance Company, an Illinois corporation, Appellees.**

No. 53568.

Court of Appeals of Oklahoma, Division No. 2.

April 6, 1982.

Rehearing Denied May 5, 1982.

Certiorari Denied June 22, 1982.

Jack T. Crabtree, Buck & Crabtree, Oklahoma City, for appellant.

Micheal L. Darrah, Procter, Fleming & Speck, Oklahoma City, for appellees.

BRIGHTMIRE, Judge.

Do material issues of fact exist for jury resolution which preclude a summary adjudication? The trial judge held there were none. We find there are and reverse.

I

The orientational facts are that plaintiff, Edwards Petro, Inc., operated a Skelly Oil Company truck stop in Oklahoma City, Oklahoma. The state condemned its property for expressway purposes necessitating relocation. Early in 1972, Edwards employed Midland Mortgage Co., a firm specializing in securing long-term loan financing, to obtain permanent financing for the construction of a new truck stop.

Midland assembled the necessary loan data and presented it to State Farm Life Insurance Company. On February 8, 1972, Midland wrote Edwards saying it had received a quote for a 15 year, $450,000 loan at an 8⅛ percent interest rate. "This loan offering," wrote Midland, "is based on the assumption that you would obtain an absolutely net lease from the Skelly Oil Company, or an unconditional guarantee of the loan by the Skelly Oil Company." For finding this lender, Midland said it was charging a fee of one percent plus out-of-pocket expenses.

Edwards obtained a blank form of the requested lease from Skelly and sent it to

Midland which sent it to State Farm on March 20.

On March 22 State Farm wrote Midland acknowledging receipt of the lease and adding, "it appears that the lease is rather straightforward. Our legal people have not reviewed the lease because we have a policy of reviewing leases only after we have an accepted commitment with a commitment fee. This lease does not appear to be one that would present a great deal of problems to us and if you can work out a satisfactory interest rate, we would be willing to recommend this deal to committee."

Skelly wrote Edwards April 10, 1972, agreeing to execute an attached lease form, amended as requested by State Farm,[1] covering the proposed truck stop property for a period equal to the life and amount of the contemplated loan divided into monthly installments of $4,900, provided Edwards executed a sublease from Skelly containing the same terms as the lease. A copy of this letter was forwarded May 1 to State Farm by Midland. In a cover letter Midland wrote, "It took some extra time to get Skelly to agree to the amendments, so there is a rush on this because the loan is to rebuild an existing structure that the state has condemned for Frontage Road. We are holding a stand-by deposit and Loan Agreement as per terms of this letter." The letter went on to describe the nature of the proposed truck stop facility, furnish background information on Edwards, enclose a copy of the amended Skelly lease form, recommend a 15 year, $500,000 loan at an interest rate of 8⅛ percent, and request a 12 month commitment.

On May 4 Midland again wrote to State Farm advising that the final draft of the plans was still with the engineering department of Skelly in Kansas City. The letter further stated that because of "a definite need to expedite this submission," Midland requested an early "commitment be subject to [State Farm] review of the final plans and specifications."

Consequently, on May 17 State Farm wrote to Midland. Said the author, "I am happy to enclose our commitment on the above captioned [Edwards loan] in the amount of $500,000, for a period of 15 years with interest at the rate of 8⅛% per annum. It is our understanding that the price will be 100 and the servicing fee ⅛ of 1%." The commitment was subject to several conditions "X'd" on the printed form. The one that forms the foundation for this controversy is number 20. It required the assignment of a lease "with minimum [*sic*] net annual rentals and lease term(s) remaining at the start of amortization of the loan as indicated; provided that if the remaining terms are less than indicated below at the time of the first mortgage payment . . . ," certain things were to follow. The terms "indicated below" were: "Skelly Oil Company 57,800 per year 15 years ($4,817 per month)."

Upon receipt of this loan commitment from State Farm, Midland wrote Edwards May 25[2] saying "our Executive Committee has approved the purchase of this loan" subject to a series of conditions which, for all practical purposes, were identical to those set out in State Farm's commitment, including the lease requirement. Edwards accepted the written conditions May 26 and began to enter into contracts and to purchase material for construction of the new truck stop.

On May 31 a State Farm "mortgage analyst" wrote Midland in response to the Edwards' letter saying, "I can inform you that the commitment fee has been received along with our accepted commitment and the commitment is in full force and effect as set forth in your letter of May 25, 1972. Before I ask our attorney to review the

---

1. Aside from the terms which Skelly agreed to amend at State Farm's and Midland's insistence, this lease and the one sent to State Farm on March 20 are identical in their terms.

2. On that same date, Midland sent State Farm a copy of the accepted State Farm commitment

and the commitment fee, with the proviso that the acceptance was conditioned on modification of a few of the commitment conditions, none of which were germane to Edwards. State Farm accepted these changes on May 31.

Skelly lease, we will need an executed copy of such lease." This was accomplished. Everything seemed set on go.

But then enters counsel. State Farm's Paul Dotson wrote Midland on June 2 announcing, "I will be handling the above captioned loan on behalf of the Legal Section . . . ." He asked that everyone be apprised of this fact and emphasized careful compliance with all dates and deadlines.

On June 13, 1972, Dotson fired his first legal missile calling attention to the fact that the monthly rent agreed to be paid by Skelly would not be a net minimum because taxes,[3] insurance costs, and repair and maintenance expenses[4] must come out of it. Several other requirements were made which we need not detail. Efforts were made to comply.

Such efforts were to be in vain, because on June 20 Dotson let go with a second torpedo, this one armed with a warhead, obviously designed to destroy the deal. In a four page letter to Midland the lawyer set out what he called a "complete list of recommendations . . . comments and requirements." The lengthy list required 10 or more major revisions or deletions[5] prompting the lawyer to confess toward the end that "I have for practical purposes rewritten the lease for you."

And the salvo found its target.

Skelly wrote Edwards on June 30, 1972, agreeing to increase the monthly rental payment to $5,400,[6] but added, "You are also assured that Skelly Oil Company will not further modify any of the other provisions contained in the above-mentioned Lease and Sublease."

Evidently informed of Skelly's reaction, Dotson returned the two lease forms with a letter dated July 18 saying, "I understand [the Edwards loan] is dead." The next day State Farm returned the $10,000 commitment fee with a letter saying, "this commitment is now considered dead."[7]

At this point Edwards was in a bind. It had begun to let construction contracts and to purchase materials and had to have construction money quick. As an "accommodation" Midland came to the rescue and arranged for its subsidiary, Midland Advisory Co., to make an "intermediate" loan at an interest rate of 12½ percent and another subsidiary, Midland Mortgage Investors Trust, to make a "permanent" five year loan at the same rate.

On May 18, 1977, Edwards filed this action against Midland, Advisory and State Farm. In its first amended petition it alleged the operative facts and asked: (1) $190,000 in damages for the amount of higher interest paid, expenses incurred and time consumed in obtaining other financing as a result of being compelled by State Farm, Midland and Advisory to seek financing elsewhere; (2) $200,000 for the impairing of plaintiff's capital and ability to honor commitments it had made to construction

---

**3.** The Skelly lease, however, specifically stated that "[i]n addition to paying rental," Skelly covenants to pay taxes assessed against its personal property located on the land, taxes assessed against the land itself, improvements and special improvements, and all utilities.

**4.** Skelly covenanted, however, to keep the demised premises repaired and in a good tenantable condition.

**5.** None of these revisions or deletions concerned the sublease from Skelly to Edwards. In fact, Dotson specifically stated in his June 13 letter that if the lease is in proper form, "then we do not care about the Sublease arrangement that Skelly makes back with the borrower, Edwards . . ., because [Skelly] is primarily obli-

gated in any circumstance." Moreover, all of Dotson's belated changes related to terms in the lease that was in State Farm's possession as early as March 1972 and well before its commitment to Edwards.

**6.** The record does not show why the monthly rental was raised to this figure, but presumably the added amount was to take care of insurance.

**7.** It is not exactly clear why State Farm decided to back out. One wonders if rising short- and long-term interest rates during the first half of 1972 had anything to do with it.

contractors based on the State Farm and Midland commitments to it, and for retarding its growth and profit potential as a result of having to pay excessive emergency interest rates; and (3) $150,000 for the detriment plaintiff suffered as a result of State Farm and Midland welshing on their commitments.

State Farm answered with a general denial, specifically stating that it never dealt directly with plaintiff and had no "privity" with it. State Farm also alleged the statute of limitations barred the action "so as to deprive this Court of jurisdiction."

Midland and Advisory filed an answer denying all of plaintiff's allegations except Midland admitted that it did make a conditional loan commitment. These defendants further alleged that plaintiff could not comply with all the conditions and that plaintiff agreed on July 19, 1972, that the commitment could be terminated. Finally, Midland and Advisory also plead the statute of limitations as a bar to "any cause of action alleged."

Plaintiff replied that the commitment made by State Farm, while addressed to Midland, was made expressly for the benefit of plaintiff and is, therefore, enforceable by it. Edwards specifically denied that the commitment was terminated by mutual consent or that its cause of action was barred by the statute of limitations.

A pretrial was held November 27, 1978. On December 4, 1978, State Farm and Midland each moved for a summary judgment. The motions were sustained on December 20. The stated bases for the pretrial adjudication were these:

"As a matter of law, Plaintiff did not meet the terms of the 'net lease' requirements contained within the *several commitment letters/contracts between the parties.*[8]

. . . .

"As a matter of law, there was no waiver of the 'net lease' requirements . . . .

. . . .

"As a matter of law, the terms of the commitment letters/contracts were not ambiguous.

. . . .

"As a matter of law, Plaintiff's Amended Petition is insufficient to state a cause in the nature of a 'detrimental reliance' upon the acts and conduct of Defendants.

. . . .

"That the oral motion of Plaintiff for leave to amend its Petition to allege fully a cause of action for 'detrimental reliance' . . . [is] denied [because such a cause] is barred by the Statutes of Limitation.

. . . .

"As a matter of law, there is no substantial controversy as to any material fact . . . ."

Plaintiff's motion for a new trial was later overruled and this appeal was timely filed.

## II

It is apparent from the undisputed recorded facts that both State Farm and Midland made a conditional loan commitment to or for the benefit of Edwards.[9] The latter agreed to the conditions and was in the process of meeting them when State Farm's legal department stepped in to kill the deal. State Farm pronounced it dead upon receipt of Skelly's reaction to State Farm's demand for rewriting the Edwards-Skelly lease. The June 20, 1972, letter from the State Farm lawyer, then, furnishes the foundation for State Farm's defense as well as the trial court's summary judgment. In other words, the trial judge held that Dotson's June 20 lease revision requirements

8. (emphasis added)

9. State Farm's was sent to Midland and was expressly for the benefit of Edwards. Midland in turn sent a so-called "retread," a substantially identical commitment, to Edwards.

were justified and Edwards' inability to meet them amounted to a failure to fulfill condition number 20.

We think the controversy can be shortened a good deal by pointing out, first of all, that the lease revision demands of Dotson in his June 20 letter were completely unwarranted in that they went far beyond the requirements prescribed in the commitment. The lease form Skelly had agreed to sign had been given to State Farm early in the game. State Farm had suggested certain amendments and Skelly had agreed to them. The amended form was in the hands of State Farm at the time it issued its commitment and in it the only requirement made with regard to the lease was that it provide for a "minimum net rental" which it "indicated" to be $4,817 per month for 15 years. State Farm prepared the commitment and thus it defined what it meant by the phrase "minimum net rental," namely an amount equal to the amortized monthly payment required to retire the State Farm loan after payment of insurance.[10]

Moreover, when it was called to Skelly's attention in Dotson's June 13 letter that the payment figure in the proposed lease of $4,900 was not enough to provide a minimum net rental equal to the loan payment after taxes, insurance and other expenses, Skelly agreed to an increased monthly rental of $5,400. Dotson never complained that this figure was insufficient, but stood on a host of other requirements which, under the circumstances, were ridiculous because they were not necessary for the protection of State Farm's repayment interests.[11] In a pretrial discovery deposition, Dotson elabo-

rated on what State Farm had in mind by use of the phrase "minimum net rental." Said he, "A lease is either net or gross. And a net lease, as distinguished from a gross lease, the tenant, in addition to paying the stipulated cash rental to the landlord, in addition takes care of all of the fixed expenses of the property, such as real estate taxes, repairs, maintenance, insurance and utilities." Needless to say, this was not spelled out in the commitment.

Whether Dotson is right or not is irrelevant. What is relevant is that he was not concerned merely with trying to arrive at an adequate "net rental," but, as he said in his June 13 epistle, with introducing a new lease concept. He wrote that the Skelly lease "is far from a bond type net Lease which ... we insist upon." He then held forth with what he considered to be "a true bond type net Lease." It is sufficient to say this belated requirement also went beyond those specified in the commitment.

Implicit in the position of State Farm and that taken by the trial court is that State Farm reserved the right to have its legal department reject the submitted lease or make such revisionary requirements as its lawyers desired to make quite apart from the commitment and its conditions.[12] The trial court's judgment, for instance, recited that Edwards was bound to "meet the ... 'net lease' requirements contained within the several commitment letters/contracts between the parties."[13]

The position is untenable. To begin with, State Farm did not refer to any such reservation in any letter or contract. The

---

**10.** As we have previously discussed, Skelly already covenanted to pay for the costs of taxes, utilities, repairs and maintenance. *See* footnotes 3 and 4, *supra*.

**11.** Other protective conditions in the commitment required, among other things, that State Farm was to get: (1) a first mortgage on the property; (2) a general assignment of rents; and (3) an assignment of the lease from Edwards to Skelly and the sublease from Skelly to Edwards; (4) the protection of "rental insurance," and, of course, broad form fire and haz-

ard insurance with loss payable to State Farm to the extent of its interest.

**12.** Condition number 32 is that State Farm is to furnish Edwards, through Midland, a "written affirmation ... that all papers in connection with this loan, including leases and collateral and supporting papers, have met with requirements and approval of our counsel."

**13.** (emphasis added)

lengthy written commitment contained some 41 individual requirements. The document began by saying, "Based on the representations in the loan submission and subject to the conditions checked below, our Investment Committee has approved ... this loan ...." Some 25 of the conditions were checked. None of them, including condition number 32,[14] made either the commitment or the lease subject to the approval of State Farm's legal department. The representation in the "loan submission" was that Skelly would sign the amended lease form which accompanied it.

The only conceivable basis for State Farm's position we can find in the record is the statement in its March 22, 1972, letter to the effect that, "Our legal people have not reviewed the lease because we have a policy of reviewing leases only after we have an accepted commitment with a commitment fee." This statement of company policy—a somewhat dangerous one it seems to us—is interesting and may even be enlightening, but it cannot and does not alter the legal effect of the later commitment. Condition number 32 did no more than acknowledge State Farm's right to have its lawyers supervise the fulfillment of the conditions and to see that each was satisfied. The scope of its lawyers' authority was circumscribed by the scope of the conditions. Reservation of a right to approve, in the sense used in condition number 32, does not include the right to invent new conditions or requirements.

### III

It was error to grant defendants a summary judgment. Based on the contents of the record at this stage of the proceedings, it appears to be a fact that Edwards was willing and able to comply with the commitment conditions and was in the process of doing so when State Farm breached its commitment by refusing to perform unless plaintiff met some new requirements it knew or should have known plaintiff could not meet. And, of course, State Farm's refusal to honor its commitment in turn required Midland to breach its commitment to plaintiff. If these are the facts, then Edwards is entitled to a judgment against, at least, State Farm and Midland.

There is some question about whether a cause of action has been stated against Advisory, but this should be considered if defendant Advisory raises it by an appropriate attack on the petition.

The summary judgment is reversed and the cause remanded with directions to proceed in a manner not inconsistent with this opinion.

BOYDSTON, P. J., concurs.

BACON, J., dissents.

BACON, Judge, dissenting.

The record presented on appeal convinces me that the trial court correctly entered summary judgment in favor of appellees.[15]

In early 1972, Edwards Petro, Inc., (Edwards), a truck stop operator that distributed Skelly Oil products, sought long-term financing to construct a truck stop in Oklahoma City, Oklahoma. Edwards contracted with Midland Mortgage Co., (MMC), a com-

---

14. See footnote 12, supra.

15. The Oklahoma Supreme Court in *Weeks v. Wedgewood*, Okl., 554 P.2d 780 (1976), and *Runyon v. Reid*, Okl., 510 P.2d 943 (1973), quoted with favor from *Aktiengesellschaft Der Harlander, etc. v. Lawrence Walker Cotton*, 60 N.M. 154, 288 P.2d 691 (1955), wherein it was said:

[T]he moving party has the burden of showing that there is no genuine issue as to a material fact and that he is entitled to judgment as a matter of law but ... when he has made a prima facie showing to this effect the opposing party cannot defeat a motion for summary judgment and require a trial by a bare contention that an issue of fact exists. He must show that evidence is available which would justify a trial of the issue. When on the basis of established facts, the [defendant] is entitled to summary judgment as a matter of law, the [plaintiff] contending and arguing that there is a genuine issue of material fact cannot and will not make it so.

pany that specializes in securing long-term financing, for its expertize in locating a long-term lender. A loan presentation was assembled and presented by MMC to State Farm Life Insurance Co., (State Farm), a company, which among other things, operates as a lender of large sums of money on a long-term basis to commercial borrowers. The security for the near $500,000 loan was a lease agreement between Edwards and Skelly whereby Skelly would enter into a 15 year lease with monthly rentals equal to principal and interest owed monthly on the loan. A lease back agreement provided that Edwards would be the actual operator of the truck stop. The loan proposal by MMC to State Farm contained a blank form of the lease.

State Farm replied to MMC that "the lease does not appear to be one that would present a great deal of problems to us and if you can work out a satisfactory interest rate, we would be willing to recommend this deal to committee."

Later, Skelly submitted a second lease and sublease to Edwards. This new lease arrangement was forwarded to MMC who in turn sent it on to State Farm. State Farm reviewed the Skelly-Edwards sublease proposed by Skelly to Edwards and issued a permanent loan commitment to MMC subject to the meeting of certain loan conditions.[16] MMC issued a "retread" of the commitment and loan conditions to Edwards.

When it became apparent to all parties that the loan conditions would not be met,

because of Skelly's refusal to modify the terms of the second lease, MMC and State Farm considered their commitments "dead" and returned to Edwards its "good faith" financial arrangement fees. The position of appellant, Edwards, will be discussed in relation to each party appellee.

To define the issue of a substantial controversy as to any material fact three questions must be asked concerning the allegations of breach of a commitment contract by promissory estoppel:

1. Does any substantial controversy as to a material issue of fact exist which if true would support a finding that Edwards complied with the condition precedent to the issuance of a permanent loan?

2. Does any substantial controversy as to a material issue of fact which if true constitute waiver of the condition precedent to issuance of a permanent loan?

3. Does any substantial controversy as to a material issue of fact exist which would give rise to estoppel?

Based upon my review of the record each should be answered in the negative.

I will first discuss the relationship of appellee, Midland Advisory Co., (MAC), to the commitment of long-term financing. After review of the pleadings, depositions and exhibits it is clear that MAC was not in any way involved in the procurement of the long-term loan. None of the communications, concerning the loan, even mention MAC. True, MAC was a party to interim construction lending but those funds were

---

**16.** A condition, that Skelly's rental payments be equal to principal and interest owed monthly on the loan, was in fact abrogated by the sublease agreement between Skelly and Edwards. It provided that any sums owed by Edwards to Skelly would be deducted from Skelly's monthly rental. True, Skelly later agreed to pay a higher rental but the new rate still remained subject to rental reduction by the sum, if any, owed by Edwards to Skelly. A lease wherein rentals are subject to reduction through a lease back agreement does not meet State Farm's initial loan condition that Skelly, via main lease become primarily liable for the loan. When Skelly advised all parties that no further modification (except increased rental)

would be forthcoming, the loan was declared dead because of failure to satisfy the condition precedent.

The death of the loan, did not come by legal assassination after a firm unconditional commitment, but came by natural causes because the antidote, meeting the required condition precedent, was not administered. The motive for declaring the loan dead bears no consequence because the record reveals no substantial controversy as to any material issue of fact that the loan's death was induced by something other than natural causes.

issued to appellant. Therefore, all contract obligations of MAC were met. The summary judgment on the issue of breach of contract by promissory estoppel, in MAC's favor was proper.

As I view the foundational facts regarding Edwards, MMC and State Farm, they could be simply stated as follows:

1. Edwards contracted with MMC for aid in securing 100 percent financing of a construction project costing approximately $500,000.

2. MMC contacted State Farm with a loan proposal containing a lease from Edwards to Skelly wherein Skelly would pay a monthly rental equal to the monthly principal and interest payment of the loan.

3. State Farm commits to MMC that if MMC can arrange a satisfactory interest rate and obtain a net lease or bond type lease it would buy the mortgage.

4. MMC commits to Edwards on the same terms.

5. Skelly did not execute a lease meeting the requirements.

6. Service funds were returned to Edwards as conditions precedent could not be met.

The exhibits clearly reflect that State Farm from the beginning of negotiations with MMC insisted and demanded that the lease place all liabilities of the loan upon Skelly, via the Edwards-Skelly lease. The record reflects nothing upon which to base an inference of waiver of State Farm's position. The lease requirement was not obtained, therefore, summary judgment in favor of State Farm was proper.

Edwards further argues that at the date of closing of the commitment letter, it inquired of MMC and MAC if it was all right to begin to let construction contracts and they replied that it was. Edwards was at that time aware that certain conditions precedent—the required lease—would have to be met before long-term financing would be secured. However, Edwards had just obtained interim construction financing from MMC and MAC. Edwards relied only upon the fact that MMC and MAC were providing interim construction financing and was well aware of the fact that it must meet the commitment requirements before the long-term financing would be issued. MMC did not, under the record, waive any of the conditions nor make any promise causing Edwards to act to its detriment.

Edwards lastly complains that the trial court erred by denying its oral motion to amend its petition to allege "civil conspiracy" upon the grounds of the statute of limitations. After the motions for summary judgment were sustained Edwards made a motion for a new trial wherein it stated:

"Plaintiff, [Edwards], respectfully moves the court to reconsider its Order Sustaining Defendants' Motion for Summary Judgment in the above entitled cause and grant Plaintiff a new trial, by reason that the Court erred in sustaining said motions as a matter of law."

However, no error was alleged as to the overruling of the motion to amend the petition.

Further, the petition in error reads:

(f) The precise points of law to be urged are that the order of the trial court sustaining Appellees' Motions for Summary Judgment is contrary to law and is not sustained by the law or evidence and that the Appellant duly excepted to such rulings in due time, expecially with respect to the following rulings contained in said order, as follows:

\* \* \* \* \* \*

(h) *The trial court's denial of Appellant's oral motion to amend its Petition to allege fully a cause of action for "detrimental reliance"* on the acts and words of MIDLAND MORTGAGE CO. was not in the furtherance of justice in this case inasmuch as the motion to amend the Petition was made before the trial of this case on its merits and was within the court's discretion to allow. (emphasis added)

Examination of the journal entry of judgment reveals the following:

This matter comes on for hearing this 20th day of December, 1978, upon the Motions for Defendants, and each of them, for Summary Judgment as against Plaintiff. Plaintiff appears by counsel, Manville T. Buford; Defendant appears by counsel, Richard A. Procter. The Court having reviewed the files, exhibits and depositions on file herein and after hearing argument of counsel and upon considering the memorandums of law submitted, finds as follows:

That the oral motion of Plaintiff for leave to amend its Petition to allege fully a cause of action for *"detrimental reliance"* on the acts and words of Defendant Midland Mortgage Co. should be denied by reason that such amendment is barred by the Statutes of Limitation. (emphasis added)

Therefore, from the record it is clear that Edwards raises for the first time on appeal the issue of amendment of its petition to allege "civil conspiracy." This it cannot do.

I would affirm the trial court in all respects.