MANCY M. DANIELS *vs.* NEW YORK, NEW HAVEN, AND
HARTFORD RAILROAD COMPANY.

MARY E. DANIELS, executrix, *vs.* SAME.

Norfolk.    March 10, 11, 1903. — May 22, 1903.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Railroad*, Signals at crossings, Death from collision at crossing.    *Negligence*, Proximate cause.    *Insurance, Life.*

In an action under Pub. Sts. c. 112, § 213, for injuries at a railroad crossing alleged to have been caused by the neglect of the railroad company to give the signals required by statute, there was testimony from persons, who were in positions where they might have heard the signals if they had been given, that they heard nothing until the danger signals were given just before the accident, and the plaintiff declared that he heard nothing until the train was right upon him and that he was sure that there was no whistle until the danger signal was sounded. Also there was evidence that the whistling post, at which according to some of the witnesses the whistle first was blown, was less than eighty rods from the crossing, in violation of Pub. Sts. c. 112, § 163, St. 1890, c. 173.    *Held*, that there was evidence to warrant a finding that the signals required by statute were not given.

The liability of a railroad company under Pub. Sts. c. 112, § 213, for the death by suicide of a person made insane by a collision at a railroad crossing, exists only when the death is the result of an uncontrollable impulse or is accomplished in delirium or frenzy caused by the collision, without conscious volition to produce death.  A voluntary act of suicide of the insane person, knowing the purpose and physical effect of his act, is such a new and independent agency as to break the line of causation between the collision and the death and prevent a recovery under the act.

In an action under Pub. Sts. c. 112, § 213, for the death of the plaintiff's testator, alleged to have been caused by a collision at a crossing of the defendant's railroad through neglect to give the signals required by statute, it appeared, that at the time of the accident the plaintiff's testator received a blow on the head and other injuries, and that his mind was clear for several weeks, after which he had circumscribed meningitis which produced mental aberration, that, about seven and a half weeks after the accident, when left alone in his sick room he locked the door on the inside, twisted a napkin around his neck and held it tightly in his hands so as to produce strangulation, from which he died soon after he was discovered. Experts testified that he probably was insane when he took his life.    *Held*, that there was no evidence that the life of the plaintiff's testator was lost by the collision.

Discussion by KNOWLTON, C. J. of death by suicide within the meaning of policies of life insurance.

TWO ACTIONS OF TORT, under Pub. Sts. c. 112, § 213, the first by Mancy M. Daniels for injuries to his person and property, and the second by Mary E. Daniels, executrix under the will of Mancy, for his death, from a collision with an engine and cars of the defendant at a grade crossing of the defendant's railroad in the town of Franklin, called Stockbridge Crossing, across which Daniels was driving in a covered milk wagon. Writs dated respectively September 15, 1899, and May 7, 1900.

At the trial in the Superior Court before *Bishop*, J., it appeared, that the accident occurred on August 12, 1899, and that Daniels died by his own hand on October 3, 1899, in the manner described by the court. The evidence tended to show, that his injuries consisted among other things of two gashes, one three inches and the other four inches long, meeting at the top of his head and penetrating to the skull ; that during the twelve days preceding his death, he was constantly delirious, often under the delusion that an engine was coming upon him, that the autopsy disclosed the existence of circumscribed meningitis, consisting of an inflammation of the membrane of the brain a little to the right of the top of the head and radiating in all directions. Medical experts testified, that in a case of meningitis resulting from an accident, several weeks frequently intervene before the disease manifests itself, that suicide would have been a natural thing to look for in this case, but that the patient could have been a monomaniac and have tried to destroy other lives, and was quite as likely to do that as to destroy his own, that his acts were the acts of an insane will, that a determination to end one's life is not inconsistent with insanity, and that traumatic delirium from which Daniels was suffering is a form of insanity commonly accompanied by violent impulses. The judge refused in each of the cases to rule that the plaintiff could not recover. In the second case, the judge, among other instructions, gave the following :

" In this case there may have been the interference of a new and independent agency. The suicide may have been the voluntary expression of the sufferer's despair at his desperate condition, and if so there is no liability arising out of the accident. In that case, it would be the result of rational volition and of

the power of the will.   But if by reason of the disease produced by the injury the mind of Daniels was taken away so that his intelligence was gone, and he had not the power of rational volition, and while in that condition he twisted the napkin and caused strangulation, you are at liberty to find that the original cause proceeded through the disease to the death and produced it.   In such a case you are at liberty to find, if you think you should in the light of the evidence of the physicians with reference to whether circumscribed meningitis would naturally be expected to follow from such an occurrence, and as to the effect of circumscribed meningitis upon the mind, that it was the natural and probable result of the accident, and a result which might naturally have been foreseen, whether in this precise form or not.   The question for you is whether or not by the power of the disease caused by the blows upon the head the man lost the power of rational volition or whether he retained it.   If he retained it he had the power to will, and the act was his own.   If he lost by that means the power of rational volition and the act was the act of his hands alone, without the power or exercise of rational volition, then you are at liberty to find that the result was traceable to the occurrence."

The jury returned a verdict for the plaintiff in the first case in the sum of $1,350, and for the plaintiff in the second case in the sum of $2,000.   In each case the defendant alleged exceptions.

*C. F. Choate, Jr.*, for the defendant.

*R. M. Saltonstall & M. Donald*, for the plaintiffs.

KNOWLTON, C. J.   These actions are brought, one by Mancy M. Daniels and the other by his executrix, the first to recover damages suffered in his lifetime, and the second to recover for his death resulting from a collision with an engine and train at a crossing of a highway on the defendant's railroad.   The negligence of the defendant, which is chiefly relied on, is the failure to give the cautionary signals required by the statute to be given at crossings of highways.

The defendant on its bill of exceptions, has argued only two questions: first, whether there was evidence which would warrant a finding that the signals were not given; and secondly, whether the death of Daniels, which resulted from his strangling

himself while he was probably insane, was caused by the defendant's negligence within the meaning of the statute.

As to the first question, although there was testimony from numerous witnesses that the whistle was blown for the crossing at the time the collision occurred, there was also testimony from others who were in positions where they might have heard the signals if they had been given, that they heard nothing until the danger signals were given, just before the accident, and there was also testimony of the declarations of the deceased that he heard nothing until the train was right upon him and that he was absolutely sure that there was no whistle until the danger signal was sounded. Although it did not appear that these last witnesses were giving much attention, we think they were so situated that their failure to hear or notice a signal, was competent for the consideration of the jury. This was especially true of the deceased who was approaching the crossing and very near it. There was also evidence that the whistling post at which, according to some of the witnesses, the whistle was first blown, was less than eighty rods from the crossing. If the signal was first given there, it was a failure to comply with the statute. Pub. Sts. c. 112, § 163. St. 1890, c. 173. *Duggan* v. *New England Railroad*, 172 Mass. 337. We are of opinion that this question was rightly submitted to the jury. *Menard* v. *Boston & Maine Railroad*, 150 Mass. 386. *Johanson* v. *Boston & Maine Railroad*, 153 Mass. 57.

The important question in the second case relates to the manner of Daniels's death and to the law applicable to a death caused as his was. He received a blow on the head and other injuries at the time of the accident, which occurred on August 12, 1899, and he died on the third day of the next October. The evidence tended to show that his mind was clear for several weeks after the accident, but after that he showed symptoms of insomnia and restlessness and began to suffer from severe attacks of headache, was melancholy and at times delirious. The autopsy after his death showed circumscribed meningitis which produced mental aberration. On October third he was left alone on his bed in a room from which the door opened into the dining room. This door was left open, and, after a time, it was found closed and locked from the bedroom on the inside.

His wife entered the room through a window, and he was discovered lying on his bed, with a napkin which had been left on a tray, used for bringing his food, twisted tightly around his neck and held tightly in his hands so as to produce strangulation. He was not then dead, but died soon afterwards. Experts testified that he was probably insane when he took his life.

The question is whether his life was lost by the collision within the meaning of the statute. The jury were well warranted in finding that his mental condition was caused by the collision. If his mental condition had remained normal, probably he would not have died in this way. We are thus brought to the consideration of the question which is often very difficult to decide, whether an essential condition precedent, is the active, efficient, proximate cause of a subsequent event, or is only a producer of conditions which open the door to another cause which directly and actively produces the result. Was death in this case a remote consequence of the collision, or was it an effect actively produced by it? A similar question has often been considered under policies of life insurance which except from the terms of the contract cases of death by suicide or by the hand of the assured. The decisions upon this question are conflicting. All agree that death self-caused in an uncontrollable frenzy, without knowledge or appreciation of the physical nature of the act, would not be death by suicide or by one's own hand within the meaning of such a provision in a policy. Some judges make a distinction between death by one's own hand and death by suicide; but most judges consider the language in either form as meaning death by one's own act. Some courts hold that if death is the result of volition by one who has a conscious purpose to end his life, and has intelligence to adapt means to ends, it is his own act within the meaning of such a contract, even though he is so far insane as not to be morally responsible for his conduct. That is the doctrine of this court as stated in *Dean* v. *American Ins. Co.* 4 Allen, 96, and in *Cooper* v. *Massachusetts Ins. Co.* 102 Mass. 227, following *Borradaile* v. *Hunter*, 5 M. & G. 639, and *Clift* v. *Schwabe*, 3 C. B. 437. The same doctrine has been laid down as the true rule by several other American courts. On the other hand, the Court of Appeals of New York and the Supreme Court of the United

States and some other courts, hold that if one, by reason of his insanity, is unable to appreciate the nature and qualities of his own act in its relations to the moral world, so that he is not criminally responsible for it, he does not commit suicide or cause death by his own hand within the meaning of such a policy, if he deliberately and wilfully takes his own life. *Breasted* v. *Farmers' Loan & Trust Co.* 4 Seld. 299. *Life Ins. Co.* v. *Terry*, 15 Wall. 580. *Manhattan Ins. Co.* v. *Broughton*, 109 U. S. 121. The question is not precisely the same in these cases as in the case now before us. The question in such policies is, What did the parties mean by their language, and some courts have invoked the principle that the language should be interpreted most strongly against the insurer who used it. In the present case the question is, What is meant by the language of the statute in reference to a death that occurs a long time after the collision, from direct causes which come into existence and take form after the lapse of weeks, or months, or possibly years, although they may be traced back to the collision as a first cause. In interpreting the present statute in reference to such facts, the question is not exactly whether the insane person who takes his life dies by his own hand or commits suicide; it is whether the act of volition, the wilful, deliberate purpose to take his life, when put in execution, is to be treated as an independent, direct and proximate cause of the death, notwithstanding that he was so far insane as to be unable fully to comprehend the moral quality of his act. In a condition such as is here supposed, the injury has caused mental disease which has weakened the forces that hold one in check and restrain him from acts of violence, and that enable him to appreciate the reasons for not interfering with the natural laws of his being. Very likely the disease also causes him extreme suffering, and deprives him of the pleasures of life, and thus exposes him to great temptation from which he would be free if in good health. In this weakened and wretched condition, lacking a sound mind to guide him morally, but still having powers which enable him to know what he thinks he wants to do and how to do it, by an act of volition, he chooses to die, and thereupon takes his own life. It may be said that he is forced to the deed by his disordered faculties. Some contend that we are all slaves of

destiny.   Our subject brings us near to the vexed theological problem as to free will and predestination.   Without attempting to pursue these inquiries too far, we are of opinion that the voluntary, wilful act of suicide of an insane person, whose insanity was caused by a railroad accident, and who knows the purpose and the physical effect of his act, is such a new and independent agency as does not come within and complete a line of causation from the accident to the death.

Suppose, under such conditions, one of an aggressive and irritable disposition should take the life of another person, when, if his mind had not been weakened by the disease, he would have held himself in control, would it be said that the life of the other was lost by the collision on the railroad?   Insanity is often a permanent condition of mind, lasting many years, and it calls for care and often for restraint of the insane person. Would suicide or the homicide of another person resulting from such conditions, after the expiration of many years, be held to be caused by the collision, within the meaning of this statute, if the insanity was the effect of a collision?

We are of opinion that the principal reasons which induced the decisions in the first class of cases under insurance policies, to which we have referred, are still stronger to compel a decision that a defendant is not liable under this statute for a death such as we have supposed.   Indeed, the Supreme Court of the United States, which holds that an insane person who takes his own life does not die by his own hand within the meaning of the words in the insurance policies, has decided unanimously in *Scheffer* v. *Railroad Co.* 105 U. S. 249, that the representative of a person who was injured in a railroad accident, and took his own life while insane about eight months afterwards, could not recover under a statute like that now before us, by showing that his insanity was caused by the accident.   We are satisfied with the conclusions reached in *Dean* v. *American Ins. Co.* and *Cooper* v. *Massachusetts Ins. Co.*, *ubi supra;* and under this statute, involving different but similar considerations, we are of opinion that the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowl-

edge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues. We are of opinion that the term "rational volition", used in the charge, was understood by the jury to mean volition attended by the powers of reason, to consider and judge of the act in all its relations, moral as well as physical, and that the charge was in this respect too favorable to the plaintiff.

The burden of proof was on the plaintiff to show that the death was caused by the collision. All the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life, that he closed the door and locked it with a view to exclude others and prevent interruption, and that he then took the napkin and used it effectively to strangle himself. All this points to an understanding of the physical nature and effect of his act, and to a wilful and intelligent purpose to accomplish it. That he was insane, so as to be free from moral responsibility, is not enough to make the defendant liable. We are unable to discover any evidence that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act. In the absence of any affirmative evidence for the plaintiff on this point, the jury should have been instructed to render a verdict for the defendant.

In the first case the exceptions are overruled. In the second case the exceptions are sustained.

*So ordered.*