WILLIAM E. FULLER, as Executor of KENNETH M. LEWIS, JR., Deceased, et al., Respondents, *v.* HARRY PREIS et al., Appellants.

First Department, December 11, 1973.

*Arthur N. Seiff* for appellants.

*Bernard S. Meyer* of counsel (*Stephen P. Seligman* with him on the brief; *Fuller, Hopkins, Lawton & Taussing,* attorneys), for respondents.

MURPHY, J.   On July 10, 1967, Dr. Kenneth Mark Lewis (hereafter "plaintiff"), a 43-year-old physician and surgeon, died from a gunshot wound which had been self-inflicted the previous day. This tragic event occurred some 7 months after the automobile driven by plaintiff was struck by a panel truck operated by defendant Preis. The other defendants are the owner and lessee of the Preis vehicle. The only question before us is whether these defendants may be held responsible for plaintiff's death. The jury and Trial Justice, who denied defendants' motion to set aside the verdict in a lengthy opinion, responded in the affirmative. We reach a contrary conclusion.

After the collision on December 2, 1966, plaintiff, although described as appearing somewhat agitated, exchanged customary pertinent information with the other driver, advised a police officer that he was uninjured and declined any medical assistance. Following the accident, plaintiff drove home where his wife observed a lump forming on the left side of his head. After experiencing projectile vomiting during the early hours of the following morning, plaintiff arranged for an examination later that day at Roosevelt Hospital, where he worked. No significant findings were made and plaintiff returned home. Within a few days thereafter plaintiff experienced the first of many convulsive seizures, which continued up to the day he shot himself. Plaintiff was admitted to Roosevelt Hospital on December 8, 1966, after his second such seizure. His condition was diagnosed as a subdural contusion and a cerebral concussion. After all symptoms had apparently cleared up, plaintiff was placed on anticonvulsant drugs and discharged four days later. The following month plaintiff spent five days at the Neurological Institute of Presbyterian Hospital and was again discharged on anticonvulsants following a diagnosis of "Post traumatic focal seizures". Following his second hospitalization, plaintiff continued to experience frequent seizures and, on medical advice, discontinued his surgical practice

and the operation of a motor vehicle; but was permitted to continue performing other medical services. At no time was he diagnosed as being insane or as suffering from any mental illness.

In April, 1967, plaintiff sued to recover for the personal injuries he allegedly sustained in the accident. After plaintiff's death his executor was substituted as the nominal plaintiff and this action was consolidated with a separate action brought by the owner of plaintiff's vehicle for property damages.

Contemporaneously with the commencement of this lawsuit, and during the period between the accident and the suicide, plaintiff was beset by a series of unrelated, or at best only tangentially related, emotional traumas. His wife, a polio victim since 1952, sustained nervous exhaustion in May and required close care; he was compelled to close his medical office and accept employment with the Strang Clinic, but then limit his work thereat because of his wife's illness; his daughter had to interrupt her schooling twice during her parents' illnesses; and he learned that his mother had cancer. On July 7, 1967, plaintiff visited his neurologist and expressed his concern over the medical conditions of his wife and mother. That same day he executed a new will. Two days later, after apparently experiencing three more seizures, plaintiff went into the bathroom of his home and shot himself.

Police officers called to the scene found two notes dated that day, each in a separate envelope, alongside plaintiff's body. One, addressed to his wife, professed his love for her and requested her forgiveness for "what I am about to do." The other, addressed to his family, was much more detailed. It informed them, *inter alia*, of the location of his will and insurance policies; urged the destruction of certain material which might prove embarrassing; cautioned against permitting anyone to see "this document [because] it would alter the outcome of the 'case'—i.e., it's worth a million dollars to you all"; referred to the other "separate note addressed to [his wife] that will—I hope—serve very well as a suicide note without jeopardizing the case"; and contained the self-diagnosis that "I am perfectly sane in mind—I know exactly what I am doing".

Prior to trial Special Term granted a motion for leave to amend the complaint to include a cause of action for wrongful death. We held that the order permitting such an amendment was not an abuse of discretion, but specifically noted that we

were not then passing on the merits of such added cause. (*Fuller* v. *Preis*, 34 A D 2d 514.)

After trial, the jury returned a verdict of $50,000 on the original cause of action for pain and suffering and $200,000 on the wrongful death claim. Pursuant to stipulation among the parties, the property damage actions were disposed of by the Trial Judge. As noted above, this appeal has been limited to that portion of the judgment below which awarded damages for plaintiff's death.

During plaintiff's confinement at Presbyterian Hospital, and thereafter, he was treated by Dr. James F. Hammill, a neurologist who had also studied, but no longer practiced, psychiatry. Although Dr. Hammill had never, at any time before the suicide, diagnosed plaintiff as being insane or psychotic, he opined, in response to a hypothetical question at the trial, that at the moment the fatal wound was inflicted plaintiff was, in lay language, insane and incapable of controlling his irresistible actions. The question assumed the truth of certain facts occurring that fatal day, as testified to by plaintiff's wife and daughter (relating to the three seizures and plaintiff's apparent mental state following each one), but omitted any reference to the two " suicide " notes or the recently executed will. Dr. Hammill was also of the opinion that plaintiff's suicide was proximately related to the injuries he sustained in the accident. Defendants' expert, a practicing neurologist and psychiatrist who had never examined plaintiff, testified that there was insufficient trauma to cause a cerebral contusion or a seizure disorder. In his considered judgment the suicide was the result of a classic depression caused by a series of emotional shocks, the final one being the discovery of his mother's fatal illness; and that plaintiff was cognizant of what he was doing, as evidenced by the detailed, but not-to-be-revealed, suicide note.

Since neither counsel nor independent research has disclosed any comparable case in this State where recovery was obtained for suicide resulting from insanity caused by a negligent act, two questions are presented on this appeal. The first is whether suicide is an independent intervening cause which, as a matter of law, precludes recovery; and the second is whether, assuming *arguendo* that the law imposes no such absolute restriction, recovery may be had under the circumstances of this case.

Preliminarily, we note that in our consideration of these questions we have placed little reliance on cases involving workmen's compensation or life insurance policies, since those

actions do not involve the basic issues of proximate causation and reasonable foreseeability to the same extent as causes grounded in general tort and, more specifically, negligence law.

In *Scheffer v. Railroad Co.* (105 U.S. 249 [1881]), recovery was sought for a suicide eight months after an accident that caused a head injury which allegedly "overcame and prostrated all [decedent's] reasoning powers and induced him * * * to take his life." The Supreme Court affirmed the dismissal of the action on the grounds that the accident was a remote, rather than a proximate, cause of death and that the act of suicide was an unforeseeable intervening cause. Some 21 years later, in *Koch v. Fox* (71 App. Div. 288), this court disagreed with one of the two stated grounds for dismissal in *Scheffer*. Without deciding the issue, which was not necessary for determination of that case, Judge LAUGHLIN stated, in pertinent part (p. 298): "If insanity resulted directly from the injuries negligently inflicted and as the natural and probable cause, I fail to see how the involuntary act of an insane man in either injuring or killing himself can be deemed an efficient independent cause constituting the proximate cause of the injuries thus inflicted upon himself, or of his death brought about by his insane acts. It seems to me that the negligent act, being the cause of his insanity which deprives him of his reason, is the proximate cause of the self-inflicted injuries or death * * * It would seem to follow that if the insanity is the natural and probable result of the injury, the party through whose negligence it was inflicted would be liable for the death of the insane person brought about by his own act".

Thereafter, the validity of the contention that a suicide is not an independent intervening cause if committed while in a state of insanity in response to an irrepressible impulse has been generally accepted in this jurisdiction and elsewhere. (See, generally, *McMahon* v. *City of New York*, 16 Misc 2d 143, affd. 3 A D 2d 713; *Firman* v. *Sacia*, 7 A D 2d 579; *Gioia* v. *State of New York*, 16 A D 2d 354, second appeal, 22 A D 2d 181; *Nugent* v. *Downing*, 33 A D 2d 1030; *Cauverien* v. *De Metz*, 20 Misc 2d 144; *Daniels* v. *New York, New Haven & Hartford R. R. Co.*, 183 Mass. 393; *Tate* v. *Canonica*, 180 Cal. App. 2d 898; *Orcutt* v. *Spokane County*, 58 Wn. 2d 846; Ann. 11 ALR 2d 751 *et seq.*; Prosser, Torts [3d ed.], p. 320; Restatement, Torts 2d, § 455; contra: *Salsedo* v. *Palmer*, 278 F. 92; *Stasiof* v. *Chicago Hoist & Body Co.*, 50 Ill. App. 2d 115.) Accordingly, under the prevailing, and in our opinion better, view it appears that self-destruction during insanity and in response to an

uncontrollable impulse without conscious volition to produce death does not, in and of itself, break the chain of causation, "provided such death be the ordinary and natural result of the negligent act, and not too remote in time, or its connection with the injury be not involved in such doubt and uncertainty as to render it inadvisable upon grounds of public policy to hold the wrongdoer responsible ". (*Koch* v. *Fox, supra,* p. 298.)

Appellants rely heavily on our affirmance, without opinion, of the dismissal of the complaint after plaintiff's opening in *Corrieri* v. *Cole* (33 A D 2d 655, affd. 26 N Y 2d 932). We agree that *Corrieri* is somewhat analogous; but a similar result is not required solely because, as appellants suggest, there is no causation as a matter of law. If such were the case we would not have permitted amendment of the complaint to add the wrongful death cause of action on the intermediate appeal. (See *East Asiatic Co.* v. *Corash,* 34 A D 2d 432.) *Corrieri* involved a suicide following a double homicide committed 17 months after the accident, which we felt was too remote in point of fact and of time from the original accident to permit recovery. While the time lapse here is not as great, we nevertheless conclude that the attempted connection between plaintiff's death and his injury is too doubtful and uncertain to hold these defendants liable. When considered in its entirety, we find the evidence adduced too speculative and therefore insufficient, as a matter of law, to support a finding that plaintiff was insane and acting under an irrepressible impulse preventing him from controlling his conduct when he shot himself. (*Blum* v. *Fresh Grown Preserve Corp.,* 292 N. Y. 241.)

Finally, were we not dismissing the wrongful death claim we would, in any event, have reversed and granted a new trial on the ground that the verdict was against the weight of the credible evidence. Notwithstanding the contrary opinion of Dr. Hammill, all of the evidence, including the execution of the will, the preparation and content of the two suicide notes and the procurement of a revolver, tended to show that plaintiff planned to take his own life and fully understood the nature and consequences of his act.

The judgment of Supreme Court, New York County (ALEX-ANDER, J.), entered December 4, 1972, to the extent appealed from, should be reversed, on the law, without costs or disbursements, and the cause of action for wrongful death dismissed.

MᴄGɪᴠᴇʀɴ, J. P., MᴀʀᴋᴇᴡɪᴄH, Kᴜᴘꜰᴇʀᴍᴀɴ and Sᴛᴇᴜᴇʀ, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 4, 1972, to the extent appealed from, unanimously reversed, on the law, without costs and without disbursements. and the cause of action for wrongful death dismissed.