**Roberto LOGARTA and Mercedes Logarta, Plaintiffs,**

v.

**Dorn Victor GUSTAFSON, Sr., Mirtha Gustafson, D.V.G., a minor, and American Spirit Insurance Co., Defendants.**

No. 96–C–1389.

United States District Court, E.D. Wisconsin.

March 26, 1998.

---

Robert D. Zapf, Lepp & Lingle, Kenosha, WI, Christopher J. Stawski, McGranaghan & Stawski, Milwaukee, WI, for Plaintiffs.

Russell M. Ware, O'Hagan, Smith & Amundsen, Racine, WI, David J. Nolden, Terrance L. Kallenbach, Capwell & Berthelsen, Racine, WI, John J. O'Neill, George R. Schimmel, O'Neill, Schimmel, Quirk & Carroll, Milwaukee, WI, Patrick W. Brennan, John P. Rocco, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Defendants.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendants' motions to dismiss and/or for a more definite statement. For the following reasons, the motion to dismiss is granted, but plaintiffs shall be allowed an opportunity to file an amended complaint remedying, if possible, the legal deficiencies in their current complaint.

## I

The following facts, drawn from the amended complaint, are presumed true for purposes of the various motions herein. They relate a story of a young man whose life ended tragically, perhaps by his own hand. Robert and Mercedes Logarta ("the Logartas") are the surviving parents of Ronald S. Logarta ("Ronald"), now deceased, whose date of birth was June 8, 1978. (Am. Compl. at ¶ 1 .) Dorn Victor Gustafson, Sr. and Mirtha Gustafson ("the Gustafsons"), are the parents of D.V.G., whose date of birth was December 24, 1978. (Am.Compl. at ¶¶ 2–3.) On January 11, 1995, D.V.G. invited Ronald to his home. (Am.Compl. at ¶ 6.) They were both 16 years old at the time, but the nature and origin of their relationship is not discussed in the complaint.

At some point during Ronald's visit, he and D.V.G. started talking about handguns. (Id.) D.V.G.'s father, Dorn, Sr., was the owner of three handguns: A .22 caliber automatic Smith & Wesson model 422, a 9mm Walther P–38, and a 9mm Browning high-power automatic. (Am.Compl. at ¶ 5.) Two of the weapons were kept in a metal case, and at least one of the weapons was always loaded, (Id.) D.V.G. had access to these weapons, even though he had no formal training in firearms and there were no trigger locks or guards on the guns. (Id.) D.V.G. had shown the guns to other children in his neighborhood, and D.V.G.'s father had told a neighbor that he kept a loaded gun under the sink in his bedroom and that D.V.G. had access to the weapon and permission to use it for protection. (Am.Compl. at ¶¶ 10–11.) Thus, when Ronald asked D.V.G. to see his father's weapons, D.V.G. was able to obtain and produce two of the handguns; specifically, one of the 9mm handguns and the .22 caliber automatic. (Am.Compl. at ¶ 6.)

D.V.G. allowed Ronald to handle the guns. (Id.) He and Ronald discussed "taking and using" said weapons, although it is not alleged that Ronald stated why he wanted the

weapons. (Id.) In any event, D.V.G. gave Ronald the loaded 9mm handgun "in exchange for" $5.00 and a credit card. (Id.) After the exchange, Ronald discussed shooting himself with the weapon. (Id.) At that point, D.V.G. and Ronald left the Gustafsons' residence and went into a cornfield behind the Logartas' residence. (Id.) Ronald took off his coat, laid it down on the ground, and then sat down on his coat with the gun in his right hand. (Id.) D.V.G. departed, leaving Ronald with his father's gun, asking only that Ronald think about what he was doing. (Id.)

D.V.G. went home. (Id.) He returned to the cornfield approximately one hour later. (Id.) He found Ronald bleeding and not moving. (Id.) He returned home immediately for assistance. (Id.) When Ronald's father arrived home shortly thereafter, D.V.G. told Mr. Logarta that Ronald was injured and bleeding in the cornfield behind their home. (Am.Compl. at ¶ 7.) Mr. Logarta ran to the scene with D.V.G. and found Ronald sitting on his coat and bleeding from what appeared to be a single gunshot wound to the right side of his head. (Id.) He then found a loaded 9mm handgun underneath his son's jacket on the left side. (Id.)

Law enforcement authorities were called to the scene, and Ronald was dead by the time they arrived. (Am.Compl. at ¶ 8.) They found the loaded 9mm handgun belonging to Mr. Gustafson at the scene, which was the weapon used in the shooting. (Id.) Although it is alleged that Ronald died instantaneously of a single gunshot wound to the head, the Kenosha County Medical Examiner stated that the "manner of death" was undetermined. (Am.Compl. at ¶ 9.)

Based on the foregoing factual allegations, the Logartas sued the Gustafsons, their son, and their insurer on five state law wrongful death claims. The claims allege that D.V.G. was negligent in giving the handgun to Ronald and that the Gustafsons were negligent in allowing D.V.G. access to the guns at issue and in failing to control or properly supervise D.V.G. The defendants have filed identical motions to dismiss, arguing that plaintiffs'

amended complaint alleges only a suicide, and that regardless of whatever negligence may have preceded the suicide, Ronald's intentional act of killing himself constituted a superseding or intervening cause which breaks the chain of causation and precludes a finding of liability. Plaintiffs do not dispute that the foregoing legal principles apply in suicide cases, but argue only that the allegations of their complaint are broad enough to include at least two scenarios in addition to suicide, both of which survive a 12(b)(6) challenge.

## II

In considering whether to grant a 12(b)(6) motion, the Court "must accept as true all well-pleaded factual allegations contained in the plaintiff's complaint, viewing all reasonable inferences in the light most favorable to the plaintiff." *McCulley v. U.S. Dept. of Veterans Affairs*, 851 F.Supp. 1271, 1276 (E.D.Wis.1994); *see also, Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir.1979). The complaint "must set forth factual allegations adequate to establish the essential elements of [the] claim . . . ." *McCulley*, 851 F.Supp. at 1276 (citations omitted). The Court may dismiss the case only if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.; see also, Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Mescall*, 603 F.2d at 1269.

█ Defendants' motions assume that plaintiffs' complaint alleges that Ronald died by his own hand. The Court agrees that this is the general thrust of the complaint, although plaintiffs argue that their allegations are broad enough to include scenarios other than suicide. In any event, let us assume that suicide is all that is alleged. The question concerning when someone may be held liable for the suicide of another has been the subject of much discussion over the years by courts and commentators alike.[1] It is a

---

1. For a summary of the case law on this subject, see Annotation, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 (1950), as well as the

question which demonstrates the notion that some moral obligations do not translate easily into legal obligations, for while we can agree (hopefully) that each of us has a moral obligation to do our best to try and prevent someone from committing suicide, "[c]ourts have traditionally shown reluctance to impose liability on others for self-inflicted harm." *Lee v. Corregedore*, 83 Hawai'i 154, 925 P.2d 324, 330 (1996) (quoting, *Donaldson v. YWCA*, 539 N.W.2d 789, 792 (Minn.1995)). This reluctance is attributable to two legal traditions borrowed from the English common law and existing throughout much of this country's history: The refusal to impose a duty to protect another from harm, and the punitive treatment of suicide.

A prerequisite to any negligence action, including those based on a wrongful death statute, is the existence of a duty requiring the defendant to conform his conduct to a certain standard of care vis-a-vis the plaintiff. *Lee*, 925 P.2d at 328–29; *Bogust v. Iverson*, 10 Wis.2d 129, 102 N.W.2d 228, 229–30 (1960). Where no such duty exists, no liability may attach. Traditionally, the common law has never recognized a duty to act affirmatively to protect another person from harm, otherwise known as a duty to rescue. *Lee*, 925 P.2d at 329; *Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948, 956 (1988); W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 375 (5th ed.1984). "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." RESTATEMENT (SECOND) OF

TORTS § 314 (1965). "This general rule rests on the law's distinction between the infliction of harm and the failure to prevent it." Ernest J. Weinrib, *The Case for a Duty to Rescue*, 90 Yale L.J. 247 (1980). Under English common law, this distinction was referred to as the difference between "misfeasance" and "nonfeasance":

There is no distinction more deeply rooted in the common law and more fundamental than that between misfeasance and non-feasance, between active misconduct working positive injury to others and passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant. This distinction is founded on that attitude of extreme individualism so typical of anglo-saxon legal thought. . . .

Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U.Pa. L.Rev. 217, 219–20 (1908). Combining with this so-called "anglo-saxon" fondness for individualist principles were the practical realities of judicial priorities. Commentators note that early "courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer serious harm because of his omission to act." RESTATEMENT (SECOND) OF TORTS § 314 cmt. c (1965) (quoting, W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 373 (5th ed.1984)). Though such judicial indifference has come under increasing criticism over the years, it remains the law in all but a handful of jurisdictions.[2] And the rule has come to be ap-

---

corresponding supplement in *ALR*'s Later Case Service.

**2.** As noted by Prosser & Keeton,

Because of this reluctance to countenance "nonfeasance" as a basis of liability, the law has persistently refused to impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life. Some of the decisions have been shocking in the extreme. . . .

&ast; &ast; &ast; &ast; &ast; &ast;

Such decisions are revolting to any moral sense. They have been denounced with vigor by legal writers. Yet thus far the difficulties of

setting any standards of unselfish service to fellow men, . . . has limited any tendency to depart from the rule. . . .

W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 373 (5th ed.1984).

Despite the reluctance of courts to depart from the general rule against a duty to rescue, some state legislatures, by the imposition of criminal liability, have imposed limited duties upon their respective citizenry to either attempt to rescue those in need of aid or at least report the predicaments of those in need to local authorities. *See e.g.*, 12 V.S.A. § 519 (Vermont); M.S.A. § 604A.01 (Minnesota); M.G.L.A. 268 § 40 (Massachusetts); RI ST § 11–37–3.1 (Rhode Island).

plied equally to cases involving suicide prevention, such that courts are reluctant to impose liability on others for self-inflicted harm. *Lee*, 925 P.2d at 330; *Nally*, 253 Cal.Rptr. 97, 763 P.2d at 959.

Another reason for this reluctance has been the historical association of suicide with criminality. This association—which is said to have existed as early as 7th century England, *see*, Bloch, 39 Stan.L.Rev. at 930, and was there explained in the oft-quoted 16th century case of *Hales v. Petit*, 1 Plowden 253, 75 Eng.Rep. 387 (Q.B.1562) [3]—was codified by Blackstone under the label "self-murder":

> SELF-MURDER, the pretended heroism, but real cowardice, of the Stoic philosophers, who destroyed themselves to avoid those ills which they had not the fortitude to endure, though the attempting it seems to be countenanced by the civil law, yet was punished by the Athenian law with cutting off the hand, which committed the desperate deed. And also the law of England wisely and religiously considers, that no man hath a power to destroy life, but by commission from God, the author of it: and, as the suicide is guilty of a double offense; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony, a felony committed on oneself.

4 W. BLACKSTONE, COMMENTARIES *189.

The foregoing characterization of suicide as a criminal act carried over to the American colonies. However, despite this characterization, the early colonies rarely exacted punishment for the crimes of suicide or attempted suicide.[4] Bloch, 39 Stan.L.Rev. at 932. The latter fact reflected a "growing consensus that it was unfair to punish the

---

Some have suggested that statutes such as these may apply to actual suicide attempts, requiring those with knowledge of the impending suicide to either report the situation or actually intervene. Kate E. Bloch, *The Role of Law in Suicide Prevention: Beyond Civil Commitment—A Bystander Duty to Report Suicide Threats*, 39 Stan. L.Rev. 929, 947–48 (1987). In Wisconsin, anyone who knows that a "crime" is being committed and that a victim is "exposed to bodily harm" must summon, and in some instances provide, assistance to the victim, or risk being prosecuted for a misdemeanor. Wis.Stat.Ann. § 940.34. The duty, however, is triggered by the occurrence of a crime, and the act of suicide is no longer a punishable crime in Wisconsin, *see*, Marzen, O'Dowd, Crone & Balch, *Suicide: A Constitutional Right?*, 24 Duq.L.Rev. 1, 240–42 (1985). Consequently, the statute would not punish the failure to report or render assistance to a suicide. Wisconsin encourages such assistance, however, by granting a "privilege" to those who "use force against another if the person reasonably believes that to use such force is necessary to prevent such person from committing suicide,...." Wis. Stat.Ann. § 939.48(5).

**3.** [Suicide] is an offen[s]e against nature, against God, and against the King. Against nature, because it is contrary to the rules of self-preservation, which is the principle of nature, for every thing living does by instinct of nature defend itself from destruction, and then to destroy one's self is contrary to nature, and a thing most horrible. Against God, in that it is a breach of His commandment, thou shalt not kill; and to kill himself, by which act he kills in presumption his own soul, is a greater offen[s]e than to kill another. Against the King in that hereby he has lost a subject.... Also he has offended the King, in giving such an example to his subjects, and it belongs to the King, who has the government of the people, to take care that no evil example be given them, and an evil example is an offen[s]e against him. *Hales*, 1 Plowden at 261, 75 Eng.Rep. at 400.

**4.** The punishments were indeed severe. Blackstone commented that in cases of self-murder, the only things the State could exact punishment upon were the two things that all perpetrators of suicide leave behind: Their "reputation" and their "fortune". 4 W. BLACKSTONE, COMMENTARIES *190. The former was punished "by an ignominious burial in the highway, with a stake driven through [the] body"; the latter, "by a forfeiture of all his goods and chattels to the king." Id. It was hoped that such punishments, through the natural care for one's reputation or the welfare of one's family, would provide "some motive to refrain ... from so desperate and wicked an act." Id. It was the severity of these punishments, however, which caused many a coroner's jury to find the deceased insane, because doing so precluded a verdict of suicide and allowed the " 'suicide a decent burial, ... the deceased's family to evade forfeiture of goods, and permit[ted] dependents to receive proceeds from insurance companies.' " Bloch, 39 Stan. L.Rev. at 931–32, 953, n. 19 (quoting, Hoffman & Webb, *Suicide as Murder at Common Law*, 19 CRIMINOLOGY 372, 377–79 (1981)).

suicide's family [through forfeiture of the suicide's lands and chattels] for his wrongdoing ." *Washington v. Glucksberg,* — U.S. —, 117 S.Ct. 2258, 2264, 138 L.Ed.2d 772 (1997). Regardless, suicide (until recently) remained a crime in many States, and even as suicide was itself decriminalized, there has been no similar retreat on laws imposing criminal penalties on those who assist another to commit suicide.[5] *Id.* 117 S.Ct. at 2264–65. The historical classification of suicide as "criminal" affected the manner in which early courts approached the issue of civil liability for suicide claims:

> The first civil action cases in this country involving suicide claims allegedly resulting from a defendant's negligent act were strongly influenced by the common law classification of suicide as a felony. As a result, the courts in those earlier cases found that the act of suicide normally terminated all civil liability of a defendant. The judicial reasoning was that suicide, being a criminal act, was typically not the foreseeable result of any alleged negligence.

*Clift v. Narragansett Television L.P.,* 688 A.2d 805, 808 (R.I.1996).[6]

In contemporary society, there has been an increasing unwillingness to classify suicide as a crime, stemming, at least in part, from the growing realization that suicidal acts are often the products of mental illness. Bloch, 39 Stan.L.Rev. at 933–34. "With this recognition, the legal focus on suicide and its prevention has shifted from degradation and imprisonment to psychiatric treatment; from criminal prohibition to civil commitment." Id. This change in the law's treatment of suicide impacts upon the issue of civil liability as well, for although courts continue to bar such liability in the great majority of cases, the analysis has shifted, from a focus on suicide as a criminal act to one of suicide as a separate, voluntary, and intentional act.

Perhaps the best formulation of the contemporary rule, and the one quoted most often in cases such as this, is as follows:

> The voluntary, willful act of suicide of an insane person, who knows the purpose and physical effect of his act, is such a new and independent agency as will not come within and complete a line of causation from a defendant's alleged negligent act in making sale of a substance or instrumentality with which human life may be taken, when there is nothing in the condition or circumstances to indicate to the seller that the substance or instrumentality will be used for such purpose. Death by self-destruction is not a result naturally and reasonably to be expected, solely, from the sale of substances or instrumentalities with which human life can be taken. Such instrumentalities and substances would cover a great variety of objects. A purchaser of gasoline might place the same in a motor and create carbon monoxide for self-destruction. A father might send his son, who is an infant, to a store to purchase a can of kerosene and use the same for self-destruction, yet we would not say that the act of the seller was the proximate cause of the death where there was nothing in the conditions and circumstances connected with the sale to indicate that the substance would be used by another for self-destruction.

*Riesbeck Drug Co. v. Wray,* 111 Ind.App. 467, 39 N.E.2d 776, 781 (1942); *see also, Runyon v. Reid,* 510 P.2d 943, 950 (Okla. 1973); *Scoggins v. Wal–Mart Stores, Inc.,* 560 N.W.2d 564, 568 (Iowa 1997).

The foregoing rule is followed in Wisconsin.[7] In *Barber v. Industrial Comm'n,* 241 Wis. 462, 6 N.W.2d 199 (1942), the deceased was an employee of an engineering company who sustained injuries to his urethra, bladder and pelvic region as a result of a work-related accident. After the accident, he suf-

---

**5.** Such laws continue to exist in a majority of States in this country, including Wisconsin. *Id.* 117 S.Ct. at 2264–65; Bloch, 39 Stan.L.Rev. at 932–33; Wis.Stat.Ann. § 940.12.

**6.** As indicated in the *Clift* decision, Rhode Island, as a common law state, appears to be one of the few which still treats suicide as a felony. *Id.*

**7.** This Court, sitting in diversity, must apply the substantive law of Wisconsin, the forum state. *Salve Regina College v. Russell,* 499 U.S. 225, 226, 111 S.Ct. 1217, 1218, 113 L.Ed.2d 190 (1991).

fered from back and pelvic pain, frequency of urination, and sexual impotence. It was claimed that the foregoing produced a mental depression which eventually caused the deceased to take his own life. The deceased's wife filed a claim for death benefits and burial expenses under Wisconsin's worker's compensation laws, but her claim was denied at the administrative level on the theory that decedent's suicide was an intervening cause of death. The Wisconsin Supreme Court agreed:

A second reason why compensation must be denied in this case is that the voluntary, wilful act of suicide resulting from a moderately intelligent power of choice is an intervening cause that precludes compensation. The rule established by the overwhelming weight of authority is well summarized in *Daniels v. New York, N.H. & H.R. Co.*, 183 Mass. 393, 67 N.E. 424, 426, 62 L.R.A. 751 [(1903)]. The court there said: "*** we are of opinion that the voluntary, willful act of suicide of an insane person, whose insanity was caused by a railroad accident, and who knows the purpose and the physical effect of his act, is such a new and independent agency as does not come within and complete a line of causation from the accident to the death. *** An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues."

*Id.,* 6 N.W.2d at 201.

This rule was reiterated by the Wisconsin Supreme Court in *Bogust v. Iverson,* 10 Wis.2d 129, 102 N.W.2d 228 (1960). In *Bogust,* the deceased was a young female college student who, due to certain emotional, social, and scholastic difficulties, had been seeking the advice of the director of a counseling center established by the school. It was alleged that the director of this center terminated his sessions with the deceased, despite his knowledge of her emotional condition, and that she committed suicide shortly thereafter. The deceased's parents brought a wrongful death action against the director.

The trial court dismissed the complaint for failure to state a claim, and the Wisconsin Supreme Court agreed, noting the general rule that suicide constitutes an intervening or superseding cause breaking the chain of causation and preluding liability:

The basic theory of plaintiffs' complaint and their argument on appeal is the foreseeability of Jeannie's suicide as the proximate result of defendant's acts and omissions. In a lengthy discussion in 11 A.L.R.2d, Liability for Suicide, § 2, p. 756, it is stated:

Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable.

\*     \*     \*     \*     \*     \*

As a general rule a person will not be relieved of liability by an intervening force which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. However, if such intervening force takes the form of suicide the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide.

*Id.,* 102 N.W.2d at 232, 233 (quoting, Annotation, *Civil Liability for Death by Suicide,* 11 A.L.R.2d 751, 756-57 (1950)).

Over the years, two exceptions to this general rule have developed. The first is where defendant's negligent or criminal conduct can be said to have caused the deceased to commit suicide. The second is where a special relationship exists between the defendant and the deceased justifying the creation of a duty to prevent suicide or other physical harm. Wisconsin courts recognize these exceptions, as do most courts confronting the issue. *See, Bogust,* 102 N.W.2d at 232; *Boles v. Milwaukee County,* 150 Wis.2d 801, 443 N.W.2d 679, 681 (App.1989); Annotation, 11 A.L.R.2d at 756; *Eisel v. Board of Education of Montgomery County,* 324 Md. 376, 597 A.2d 447, 450 (1991); *McLaughlin v.*

*Sullivan,* 123 N.H. 335, 461 A.2d 123, 124–25 (1983); *Falkenstein v. City of Bismarck,* 268 N.W.2d 787, 790–91 (N.D.1978); *Nally,* 253 Cal. Rptr. at 105–06, 763 P.2d at 956; *Lee,* 925 P.2d at 330; *Clift,* 688 A.2d at 808–10; *Moss by Moss v. Meyer,* 117 Ill.App.3d 862, 73 Ill.Dec. 304, 454 N.E.2d 48, 50–51 (1983); *Trapnell v. United States,* 1997 WL 768581 *1 (4th Cir.1997); *Webstad v. Stortini,* 83 Wash.App. 857, 924 P.2d 940, 946 (1996). Under the current allegations of the complaint, neither exception applies here.

■ Taking the second exception first, it is clear that there was no special relationship between Ronald and D.V.G., or D.V.G.'s parents, sufficient to create a duty to prevent Ronald from committing suicide. Such relationships are typically "custodial" in nature, or at least "supervisory", such as the doctor-patient relationship associated with hospitals or mental institutions, the jailor-inmate relationship associated with prisons and local jails, and sometimes the teacher-student relationship associated with schools. *See e.g., Lee,* 925 P.2d at 329–30; *Nally,* 253 Cal.Rptr. 97, 763 P.2d at 956–57; *Figueroa v. State of Hawaii,* 61 Haw. 369, 604 P.2d 1198, 1203–04 (1979); *Eisel,* 597 A.2d at 450–52; *McLaughlin,* 461 A.2d at 125; *Webstad,* 924 P.2d at 946–47. They are not created by the relationship between an owner of property and his social guests or invitees. *Webstad,* 924 P.2d at 948. The latter is the only relationship alleged here.

■ The case is closer with respect to the first exception. The complaint alleges sufficient facts stating a viable claim of negligence against the Gustafson's for granting D.V.G., a minor, access to a loaded gun. Annotation, *Liability for Injury or Death of Minor or Other Incompetent Inflicted Upon Himself by Gun Made Available by Defendant,* 79 A.L.R.3d 825, §§ 12–14 (1977). In addition, D.V.G.'s alleged act of transferring a loaded gun to Ronald, also a minor, is not only potentially negligent, but also criminal.[8] Such allegations support an argument that the negligent and criminal actions of the Gustafsons and D.V.G. caused Ronald's suicide, because "but for" these actions Ronald

would not have obtained the weapon he used to kill himself. The question is whether such an argument states a claim under the first exception to the general rule against civil liability for suicide. Based on the current allegations of the complaint, the Court concludes that it does not.

There are only two types of factual scenarios that support a claim under this exception. The first scenario is where the defendant's negligence or wrongful act creates in the deceased an uncontrollable impulse, a delirium, frenzy or rage, during which he commits suicide without conscious volition to produce death. Many courts recognize this exception, including the Wisconsin Supreme Court. *See, Bogust,* 102 N.W.2d at 232; *Clift,* 688 A.2d at 808 (quoting *Bogust,* quoting *Daniels v. New York N.H. & H.R. Co.,* 183 Mass. 393, 67 N.E. 424 (1903)); *McLaughlin,* 461 A.2d at 124; *Falkenstein,* 268 N.W.2d at 790–91; *Moss,* 73 Ill.Dec. 304, 454 N.E.2d at 50–51. Typically, "[s]uch cases ... involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture." *McLaughlin,* 461 A.2d at 124. The theory is that suicide breaks the chain of causation only if it was intentional; suicide resulting from delirium or an uncontrollable impulse created by the defendant's wrongful act preserves the chain of "direct causation". *Id.* The flip side is that where suicide results from "a moderately intelligent power of choice, even though the choice is determined by a disordered mind", or by a "morbid" mind "unable to tolerate the pain, inconvenience and humiliation" of its particular condition, the suicide is "a new and independent, efficient cause of the death that immediately ensues." *See, Bogust,* 102 N.W.2d at 232; *Barber,* 6 N.W.2d at 201; *Clift,* 688 A.2d at 808 (quoting *Bogust,* quoting *Daniels*). Here, the complaint contains no allegations concerning Ronald's mental state, either prior to or after obtaining the gun from D.V.G., or during the suicide itself. There are no allegations that D.V.G.'s conduct, or the actions of the Gustafsons, inflicted upon Ronald severe physical

---

**8.** In Wisconsin, it is a felony for any person to intentionally sell, loan or give a dangerous weapon to a person under 18 years of age. Wis.Stat. Ann. § 948.60(b).

injury, or the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture. There are no allegations that Ronald succumbed to an uncontrollable impulse, or a frenzy or delirium, which deprived him of his ability to recognize the nature and likely result of his actions. To the contrary, the complaint portrays a young man who calmly asked for a gun, proceeded to make his suicidal intentions known, selected a location, and then carried those intentions out to their tragic end after being reminded to "think about" what he was doing. There is simply nothing in the complaint from which the Court could conclude that the suicide resulted from anything other than "a moderately intelligent power of choice".

■ The second scenario is where the defendant's wrongful act consisted of supplying the deceased with the instrumentality of his suicide. Such is the crux of plaintiffs' allegations here. In these situations, liability may be imposed under two possible sets of circumstances. The first is where facts are pled indicating that the defendant knew or should have known, at the time of supplying the deceased with the item in question, that he intended to use it to commit suicide. *See e.g., Scoggins,* 560 N.W.2d at 567–70 (and cases cited and discussed therein); *Knight v. Wal–Mart Stores, Inc.,* 889 F.Supp. 1532, 1539–40 (S.D.Ga.1995); *Runyon,* 510 P.2d at 950; *Drake v. Wal–Mart, Inc.,* 876 P.2d 738, 740–41 (Okl.App.1994). Here, the complaint contains no allegations indicating that D.V.G., at the time he gave the loaded weapon to Ronald, had reason to know that Ronald intended to use it to commit suicide. To the

contrary, the complaint alleges that Ronald did not state his intention to commit suicide until *after* D.V.G. gave him the weapon. The second is where the State or Federal government has a criminal statute prohibiting the conduct at issue, and that statute creates a standard of care for purposes of civil liability which, if violated, results in a finding of negligence per se. *See e.g., Crown v. Raymond,* 159 Ariz. 87, 764 P.2d 1146 (App.1988); *Knight,* 889 F.Supp. at 1535–38; Annotation, 75 A.L.R.3d 825 §§ 3–11. Wisconsin has a criminal statute prohibiting the transfer of dangerous weapons to minors. Wis.Stat. Ann. § 948–60(2)(b). The rules governing whether that statute establishes a standard of care for purposes of civil liability are set forth in the RESTATEMENT (SECOND) OF TORTS §§ 286 & 288 (1965), which has been quoted with approval by the Wisconsin courts. *See, Hagerty v. Village of Bruce,* 82 Wis.2d 208, 262 N.W.2d 102, 105 (1978); *Kalkopf v. Donald Sales & Mfg. Co.,* 33 Wis.2d 247, 147 N.W.2d 277, 280–81 (1967); *Reque v. Milwaukee & Suburban Trans. Corp.,* 7 Wis.2d 111, 97 N.W.2d 182 (1959). The Court need not apply these rules, however, because the Wisconsin Court of Appeals has already determined that the statute does not set a standard for civil liability and that violation of the same does not constitute negligence per se. *See generally, Olson v. Ratzel,* 89 Wis.2d 227, 278 N.W.2d 238 (App.1979).[9] Thus, the normal rules of common law negligence apply. Because the allegations of the complaint do not fit within one of the recognized exceptions to the common law rule precluding civil liability for suicide, the complaint must be dismissed.[10]

**9.** Actually, *Olson* interpreted Wis.Stat.Ann. § 941.22, a predecessor to the current § 948.60. Section 941.22 was repealed when § 948.60 was created in 1987. The pertinent language of the two statutes, however, has not changed materially, and for our purposes the appellate court's decision in *Olson* is applicable to § 948.60.

**10.** Had the Wisconsin Court of Appeals ruled differently in *Olson,* plaintiffs would have a strong case for liability. This is because "[f]actual questions of foreseeability are part of the negligence and not the causation inquiry in Wisconsin tort law." *Olson,* 278 N.W.2d at 246. "Where a defendant's act amounts to a violation of a standard of care fixed by statute or previous court

decision and the violation is held to be negligence Per se, no inquiry is permitted as to reasonable anticipation or foreseeability of harm. In such cases, the jury will not be permitted to find the harm resulting from the act was unforeseeable and the defendant was therefore not negligent." *Id.,* 278 N.W.2d at 245. Thus, under Wisconsin's approach to negligence per se, defendants would not be able to argue that Ronald's intentional act of suicide constituted an unforeseeable intervening event which broke the chain of causation. All plaintiffs would have to show is that the criminal statute was violated, and said violation was a "but for" cause of Ronald's suicide.

## III

The foregoing discussion assumes that the complaint sets forth only a single manner of death: Suicide. Plaintiffs argue that the circumstances surrounding Ronald's death are hazy enough to allow the possibility of two other factual scenarios: (1) D.V.G. accidently shot Ronald while the two were examining or otherwise using the gun; or (2) a third party came upon the scene after D.V.G. went home, took the gun from Ronald, and killed him.[11] Plaintiffs emphasize that, at the time of their response to the current motions, no discovery had yet taken place, the time for discovery had not yet expired, and they had not yet received copies of the relevant police reports. Moreover, in drafting the complaint, all they had to rely upon were "facts and self-serving statements supplied by witnesses that were immediately available." Plaintiffs suggest the facts might change once the discovery process is in full gear.

Several months have now passed, and plaintiffs presumably received the desired police reports and the parties should have begun the discovery process, Plaintiffs should be in a position to plead these alternative scenarios as separate theories of recovery if the facts and the law so warrant. Moreover, plaintiffs may now possess factual information allowing them to plead a suicide scenario that falls within one of the recognized exceptions to the rule precluding civil liability. Accordingly, though the Court dismisses plaintiffs' current complaint, it will allow plaintiffs an opportunity to cure any defects therein or assert alternative theories of liability by filing an amended complaint.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendants' motions to dismiss the amended complaint are granted; and

2. Plaintiffs have until April 27, 1998 to file a second amended complaint in this matter. Failure to do so will result in the final dismissal of the case with prejudice.

**SO ORDERED.**

---

**11.** The first scenario probably states a valid cause of action. The second suffers from the same defects as the suicide scenario, because the intentional act of murder by a third-party who arrived after D.V.G. left the scene is similarly unforeseeable and breaks the chain of causation. *See generally, Chapman v. Oshman's Sporting Goods, Inc.*, 792 S.W.2d 785 (Tex.App.1990); *Robinson v. Howard Bros. of Jackson, Inc.*, 372 So.2d 1074 (Miss.1979). As was stated by the *Robinson* court:

> The question of foreseeability is important in our case because there is less reason to anticipate premeditated and malicious acts as opposed to acts which are merely negligent. A clear statement on the question of foreseeability appears in Prosser's, ... where the author states:

> There is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely negligent; and this is all the more true where, as is usually the case, such acts are criminal. Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.

*Robinson*, 372 So.2d at 1076.

